## THE STATE v. WILLIAM SPAUGH, Jr., Appellant.

### Division Two, December 22, 1906.

1. **CONSPIRACY: To Commit Murder: Sufficiency of Proof.** Defendant had assaulted a young man in a restaurant, and had the owner telephone to one Brown to come to defendant's house, and when Brown arrived there defendant and his mother and brother were on the front porch, and he heard defendant say that he would not be arrested and that he would kill any one who came to arrest him, and heard the mother say that she would not let any one take them but would kill whoever came after them. When the sheriff was seen to be coming the mother and brother went into the house, and when the sheriff reached the gate he called to defendant to come out, who asked him if he had a warrant, to which the sheriff replied, "Never mind what I have got, come on out here." Thereupon defendant went into the house, and the sheriff followed, and was killed within two or three feet of the door. *Held*, that, in view of the conversation on the porch, in view of the fact that Brown heard some one inside cry out, "Kill him," in view of the fact that the sheriff was shot four times, both a shotgun and a rifle being used, any one of which shots was sufficient to produce instant ·death; in view of the retreat from the house of defendant and his brother immediately after the ·shooting, each armed with a deadly weapon, and their immediate flight, in view of their secreting themselves· in a cabin in another county for six days, and in view ·of their joint resistance of arrest when surrounded by a posse, there was ample evidence of a conspiracy and of a common unlawful purpose to kill the sheriff if he attempted to arrest the defendant.

2. ————: **Statements.** Besides, defendant's own statement after his arrest amply established the fact that he killed the sheriff, and did so because he did not wish to be arrested.

3. **MURDER: Proof of Another Crime.** Proof of another crime than the one for which defendant is on trial is competent to prove the specific crime charged, when that proof tends to establish the motive, intent or absence of mistake or accident, or the identity of the defendant. In this case the proof was that defendant had assaulted another twenty or thirty minutes previously, and had gone home and declared he would not be arrested therefor, and it is *held*, that such proof was competent as demonstrating defendant's motive for killing the sheriff who came a' few minutes thereafter to arrest him. It also serves to· explain the presence of the sheriff at defendant's home, and the

State v. Spaugh.

conduct of the defendant in shooting him at that time; and hence, whatever information of the assault was given to the sheriff by any person which tended to show that he had reasonable ground to believe a felony had been committed by defendant, and hence had the right to arrest him without a warrant, was competent evidence.

4. ———: **Arrest: Without a Warrant: Felony: Evidence.** A sheriff, who on his own knowledge of the facts, or on facts communicated to him by others, has a reasonable ground to believe that a certain person has committed a felony, has the right to arrest such person without a warrant; and if in an attempt to make such arrest the sheriff is killed, evidence which tends to show that he had reasonable ground for believing defendant had committed a felony, is competent in the trial of defendant for murder.

5. ———: **Confession: To Physician: Competency.** To exclude evidence of defendant's confession, it must appear affirmatively that some inducement to confess was held out to him by or in the presence of some one in authority. Where the defendant began the conversation himself with physicians called to treat him for wounds received at the time of his arrest, and made statements concerning his participation in the killing of deceased, without any promises being made or threats of violence, testimony of the physicians as to what he then said is competent.

6. ———: **Proof of Another Crime: Res Gestae: Withdrawal.** The State was permitted to prove an assault upon a young boy by defendant, and that in an attempt to arrest defendant for such assault the sheriff was killed. A bystander who witnessed the assault was permitted to testify that he took hold of defendant and pushed him out of the door and that defendant kicked him. To this evidence of this kicking defendant objected, but assigned no reason for the objection. The court at first admitted this evidence, but afterwards of its own motion withdrew it. *Held*, that the kicking of the boy was so immediately connected with the assault as to be a part of the *res gestae*; but even if it were not, the most that can be said against it is that it was irrelevant, and was not so prejudicial as to work any harm to defendant in view of the fact that the court promptly withdrew it.

7. ———: **Arrest of Witness: Explanation.** Where the defendant has sought to create the impression that a witness who was close by the killing was induced to make a sworn statement by a promise made after his arrest, that, if he would make a sworn statement he would not be prosecuted as an accomplice, it is proper to permit the prosecuting attorney to explain why

such witness was arrested, and to deny that he was put in jail on the charge of murder.

8. ———: Flight: Resisting Arrest: Guns: Connected With .Crime. It was proper to permit the State to show that immediately after the killing of the sheriff, the defendant and his brother armed themselves and fled to the mountains and for six days evaded arrest and when finally located in· another county they resisted arrest to the utmost by firing at the posse, and when captured had in their possession· a shotgun, rifle, revolver and a quantity of ammunition. Nor' did the fact that the pistol and dynamite cartridges were not shown to·have been used in killing the sheriff, nor in anywise connected with that crime, make incompetent evidence that they were found in their possession at the time of their capture.

9. ———: ———: Shooting As They Ran. It was competent as an indication of the guilt of defendant .and his brother for the State to show that soon after the homicide and as they were endeavoring to escape, defendant shot at a negro who was running towards him.

10. ———: Instruction: Reasonable Doubt. The instruction on reasonable doubt in this case is unassailable.

11. ———: Of An Officer: Knowledge of Official Character. If a defendant kill an officer of whose official character he has no notice, it is homicide in self-defense, if the killing was apparently necessary to save defendant's life, even though the officer was at the time attempting to arrest him for having committed a felony.

12. ———: ———: ———: When an Issue: When Instruction Necessary. Where there is an issue in the case as to whether or not the defendant in resisting arrest was informed of the official character of the officer attempting to arrest him· and of his intention to make the arrest, it is the duty of the court to submit to the jury by proper instruction the question of defendant's knowledge of the official character of the officer' he killed and of the officer's intention to make the arrest. · But where there is no such issue in the case, a failure to give any instruction on the subject is not error.

13. ———: ———: Knowledge Assumed at Trial. Where the case was tried on both sides on the theory that defendant knew the official character of deceased sheriff and that deceased came to his house to arrest him, it was not error for the trial court to fail by an instruction to put in issue defendant's knowledge on that subject.

14. ———: **Arrest Without Warrant: Manslaughter.** Where the sheriff had been informed that defendant had assaulted and put out the eye of another, which is a felony, and had reasonable ground to believe that defendant had committed that felony, he had authority to arrest defendant without a warrant; and where defendant knew the official character of the sheriff and knew he had come to arrest him for that felony, and resisted arrest, and killed the sheriff, there is no room in the case for instructions on manslaughter.

15. ———: **Manslaughter: No Issue.** Where defendant denied the killing and all knowledge of it until afterwards, and the only issues in the case were, on the part of the State that defendant was guilty of deliberate and premeditated murder, and on the part of defendant that he had nothing to do with killing deceased, there was no ground for an instruction on the law of manslaughter.

16. ———: **First Degree.** Where there was evidence that defendant had committed an assault and had threatened that he intended to kill anyone who attempted to arrest him, and on the sheriff's coming and calling on him to surrender he retreated into his house and armed himself with a gun and when the sheriff entered killed him, such deliberation was shown as authorized the court to give an instruction on murder in the first degree.

17. ———: ———: **Erroneous Instruction for Second Degree.** Where defendant was convicted of murder in the first degree, he is in no position to complain of error in the instruction for murder in the second degree.

18. ———: ———: **Deliberately: Definition.** An instruction which defines "deliberately" to mean: "In a cool state of the blood. It does not mean brooded over, considered, reflected upon for a week, a day or an hour, but it means an intent to kill executed by a person not under the influence of violent passion suddenly aroused by some unlawful provocation, but in furtherance of a formed design to gratify a feeling of revenge or to accomplish some unlawful act. And the passion here referred to is that only which is produced by what the law recognizes as a just or lawful cause of provocation," sufficiently defines deliberately, and is not erroneous as improperly defining violent passion.

19. ———: ———: **By Act of Co-Defendant.** An instruction that permitted the jury to find defendant guilty if he and his brother willfully, etc., did, each with a gun, that is to say, one of them with a shotgun and the other with a rifle, or one of them with a shotgun and the other with a pistol, shoot and kill deceased,

did not permit the jury to convict defendant upon evidence given against his brother.

20. ――――: **Juror: Expressed Opinion.** The charge in the motion for a new trial that one of the jurors had formed and expressed an opinion of defendant's-guilt, which is supported by affidavits and the testimony of witnesses, and met by counter affidavits and testimony of other witnesses, is best disposed of by the trial court, and if its finding is supported by substantial evidence it will not be disturbed on appeal.

21. **JURORS: Separation.** After the case was submitted to the jury, one of them was taken by a deputy sheriff to attend to a call of nature, the others remaining in the jury room locked up. The one juror did not talk to the deputy sheriff about the case and saw no other person. *Held*, that there was no separation of the jury such as the law condemns.

22. ――――: ――――: **Misconduct.** The jurors, for want of a better place, occupied the circuit court room at night, and on one occasion one of them examined the statutes to see what fees they were allowed for their services, and another read a homicide case as reported in the Missouri Reports. *Held*, that this was no such misconduct as would authorize a reversal.

23. ――――: **Intrusion of Outsiders: Giving Whiskey to Jury.** It would be going too far to set aside the verdict on the mere ground that a deputy sheriff brought whiskey to the sheriff, who had charge of the jury and who had at their request undertaken to procure a small amount of whiskey for them, and remained in the jury room only long enough for the jurors to take a drink, before retiring for the night, it clearly appearing that the deputy had no communication with the jury, nor they with him. But the conduct of the sheriff and his deputy is not to be excused.

Appeal from Reynolds Circuit Court.—*Hon. Joseph J. Williams*, Judge.

AFFIRMED.

*Williams & Frazier, D. L. Rivers, James A. Finch, J. B. Daniel* and *A. Steel* for appellant.

(1) The court erred in not sustaining defendant's demurrer to the State's evidence at the close of the State's case, for the reason that it was shown that the

defendant and his brother, co-defendant, were both in
the room at the time of the alleged crime, and there is
grave doubt as to which was the slayer, and the de-
fendant's evidence tending to show that he had nothing
to do with the killing, and because it was not shown
that they were confederates or that they were engaged
in a common design, of which the offense was a part.
Green v. State, 13 Mo. 382; State v. Walker, 96 Mo. 95;
9 S. W. 649; 11 S. W. 1133.    (2)    The court erred in
admitting evidence, over the objection of defendant, as
to the prior difficulty that took place at the restaurant
of Rascher between defendant and Edgar, which said
difficulty took place some twenty-five minutes before
the alleged killing, for the reason that it was a separate
and distinct crime, and in no way connected with the
murder, and was a crime less than a felony, and in no
way would even be admissible to show that the alleged
officer was justified in going on the premises of the
defendant without a warrant, as he did, at the time of
the killing.    Bank v. Bank, 64 Mo. App. 253; State v.
Summers, 26 Mo. 350; State v. Young, 119 Mo. 495;
State v. Parker, 96 Mo. 382; Swan v. Com., 104 Pa. 218;
People v. Sharp, 107 N. Y. 427; Com. v. Jackson, 132
Mass. 16; People v. Molineux, 67 L. A. R. 237; State v.
Schmetler, 181 Mo. 173.    (3)    The court erred in ad-
mitting evidence of Rascher, over objections of defend-
ant, where he testified to having kicked the defendant
in a previous difficulty with Edgar, at his place of
business, which said evidence was afterwards taken
from the jury by oral instruction of the court; it being
expressly held that an instruction to disregard testi-
mony improperly admitted in a criminal case will not
cure the error of admitting it, if it was of a character
prejudicial to the defendant.    State v. Mix, 15 Mo. 153;
State v. Marshall, 36 Mo. 400; State v. Frederick, 85
Mo. 145; State v. Kurehner, 93 Mo. 193; State v.
Thomas, 99 Mo. 235.    (4)    The court erred in failing

to instruct the jury in relation to defendant's knowl-
edge of the official character of Polk, in his act of at-
tempting to arrest defendant, as testified to by the wit-
ness for the State as well as witnesses for defendant;
according to the evidence no announcement was made of
his official character in the Spaugh home. In view of
the evidence on this point it is a question of fact, to be
decided by the jury, as to whether defendant knew
the official character of Polk, and it was manifest error
for the court to fail to cover this point with proper in-
structions. State v. Underwood, 75 Mo. 236; 1 Wharton
Crim. Law, sec. 419; State v. Bateswell, 105 Mo. 614;
State v. Dieberger, 96 Mo. 666; State v. Fuller, 96 Mo.
165; State v. Underwood, 75 Mo. 230; State v. Grant, 76
Mo. 246. (5) The court erred in refusing to give in-
struction covering the law in regard to manslaughter in
the fourth degree, as the evidence of defendant and his
witnesses and that of the State fully justified it. State
v. Ellis, 74 Mo. 216; State v. Garrison, 147 Mo. 548;
State v. Gartrell, 171 Mo. 489; State v. Weakley, 176
Mo. 413; State v. Berkley, 92 Mo. 41. (6) The court
erred in overruling the motion for a new trial on the
evidence of Jordan, wherein he testifies that Mr. Fitz,
a deputy, who had not been sworn specially to take
charge of the jury and not to communicate with them
during their deliberations, was permitted to have
charge of the jury, was in the room with them, had
every opportunity to talk to them and did talk to them;
that said Fitz took liquor into the jury, and in view
of the evidence that none of the jury who testified that
he, Fitz, did talk to them, but put it about other mat-
ters, and especially in view of the evidence of Fitz,
himself, to the effect that he did go out of the jury room
and disclose how the jury stood. The court said, in
the case of State v. Neibekier, 184 Mo. 211, that where
some unnamed person upon the outside said the jury

stood nine to three for murder, was no ground for setting aside the verdict, especially in view of the fact that the sheriff testified that he had not left the door, and that no one had an opportunity to converse with the jury. State v. Neibekier, 184 Mo. 211; State v. Hays, 78 Mo. 600; State v. Frier, 115 Mo. 643; State v. Taylor, 134 Mo. 109.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) (a) The State's evidence on the subject of an assault by defendant on Edgar, only a few minutes prior to the commission of the murder, was properly admitted. It showed that defendant had committed a felony, and it clearly justified the deceased in going to defendant's home, in his endeavor to arrest defendant, and it showed a motive for the commission of the crime here charged. State v. Grant, 79 Mo. 136; State v. Collins, 181 Mo. 259; State v. Rudolph, 187 Mo. 84. (b) It was also proper to admit the testimony of State's witness Ernest Rieke to the effect that said witness reported to Sheriff Polk that defendant had assaulted the Edgar boy; that the witness thought defendant had put out Edgar's eye, and that his face was bloody, etc. So of the testimony of State's witness John Baldwin, to the effect that he received a telephone message from the depot, and that he reported to Sheriff Polk that there was trouble, and he was wanted at the depot. State v. Grant, supra; State v. Collins, supra; State v. Rudolph, supra; State v. Cushenberry, 157 Mo. 168. (c) Evidence that, immediately after the murder of the sheriff, defendant and his brother armed themselves and fled to the mountains, that they evaded the officers for six days, that they made resistance to the utmost, and that they were found in possession of a shotgun, a pistol and a quantity of

ammunition, was properly admitted. Such evidence has always been considered admissible in behalf of the State, and a proper subject for the consideration of the jury. State v. Moore, 101 Mo. 330; People v. Petmecky, 2 N. Y. Crim. 459; 4 Elliott on Evidence, sec. 2724; 1 Wigmore on Evidence, sec. 276; Underhill on Crim. Evid., secs. 118, 120; Bishop on Crim. Proc. (3 Ed.), sec. 1249; Wharton's Crim. Evid. (9 Ed.), sec. 750; Jamison v. People, 145 Ill. 376; State v. Shaw, 74 Vt. 153; Wills on Cir. Evid., 130-137; Com. v. Bittle, 200 Pa. St. 648; State v. Phillips, 118 Iowa 666; People v. Flannelly, 128 Cal. 87; Bowles v. State, 58 Ala. 335; People v. Fredericks, 106 Cal. 516; Wharton on Homicide, sec. 710. (d) The State's evidence that tended to prove that the defendant, just after the commission of the homicide, and while he was running away, stopped and fired at Len Arnett, was properly admitted. Arnett was a witness to the killing, and was running towards the defendant at the time defendant shot at him; hence, said evidence tended to prove that defendant was trying to prevent being captured. The fact that said evidence tended to prove the commission of another crime by defendant does not alter the rule. State v. Taylor, 118 Mo. 162; State v. Sanders, 76 Mo. 36; 1 Greenl. on Evidence, sec. 108; State v. Vinso, 171 Mo. 587; Wilkerson v. State (Tex.), 19 S. W. 903. (e) No error was committed in admitting in evidence the various confessions made by defendant, and by his brother in the presence of defendant. In each instance, the trial court excluded the jury, and passed on the preliminary questions, and then the jury was returned into court and the witness allowed to repeat his evidence relative to defendant's confession. "The presumption is that confessions have been freely made until the contrary appears." People v. Barker, 60 Mich. 295; State v. Myers, 99 Mo. 119; Com. v. Culver, 126 Mass. 464; 1 Chitty's Crim. Law, 571; Roscoe's

Crim. Evidence, 43; 3 Rice on Crim. Evid., sec. 309. The fact that the confession was made to an officer after defendant had been arrested did not tend to prove that any undue influence was used, or that any threats were made or promises held out. State v. Jones, 171 Mo. 406; State v. Brennan, 164 Mo. 487; State v. Guy, 69 Mo. 432; State v. Simon, 50 Mo. 372; State v. Davis, 53 Pac. 682; State v. McClain, 137 Mo. 315; State v. Vaughan, 152 Mo. 75; State v. Anderson, 96 Mo. 248; State v. Patterson, 73 Mo. 703; State v. Hopkirk, 84 Mo. 278; State v. McKenzie, 144 Mo. 46; State v. Coella (Wash.), 28 Pac. 30. (f) No error was committed by the trial court in admitting the evidence of State's witness Rascher, to the effect that he took hold of and pushed defendant out of his restaurant, and that defendant kicked him. This occurred immediately after the assault which defendant made on the Edgar boy, and was a part of said transaction. At most, said evidence was irrelevant and its admission in the first instance non-prejudicial. But, after the court directed the jury to disregard the same, the error, if any occurred, was cured. Sparr v. Wellman, 11 Mo. 236; Minns v. State, 16 Ohio St. 221; Com. v. Shepard, 6 Birm. (Pa.) 282; 2 Thomp. on Trials, sec. 2415. (g) Defendant also objected to the prosecuting attorney's testifying to the circumstances connected with the arrest of State's witness Brown, on the charge of being implicated in this homicide, and of his release. In the cross-examination of said witness by defendant's counsel an effort was made to impress upon the jury the idea that Brown had been arrested on the charge of murder and released, provided he would testify against the defendant, etc. Having gone into the question of the arrest and release of Brown, it was but fair to the State for the jury to know all of the facts in reference thereto. If defendant was injured thereby, he can blame no one but himself, as he started the inquiries along that

line, and opened up that question. 1 Thomp. on Trials, sec. 483. (h) The trial court properly admitted evidence to the effect that the defendant and his brother, at the time of their arrest, had in their possession a shotgun and a pistol. It was competent as tending to prove the kind of resistance they made when they knew that the officers (not a mob, as suggested by defendant's counsel) were trying to arrest them; and, besides, no objections were made to said evidence. After said pistol had been identified as the one defendant had in his possession, and after it had been identified as the one that belonged to Sheriff Polk, it was proper that the pistol itself should be introduced in evidence, as it was. The State's evidence further showed that in the hip pocket of the dead sheriff there was found an empty pistol scabbard, and the deceased's coat tail was pulled up above this pocket; thereby connecting the defendant with the commission of this homicide in the most convincing way. Weapons with which the alleged homicidal act was committed have always been considered as proper evidence, when properly identified. Wynne v. State, 56 Ga. 118; Siberry v. State, 144 Ind. 684; State v. Jones, 89 Iowa 182; Rodriquez v. State, 32 Tex. Crim. 263; People v. Sullivan, 129 Cal. 557; Spies v. People, 122 Ill. 236; State v. Roberts, 63 Vt. 142; State v. Tucker, 52 W. Va. 434; State v. Cushing, 14 Wash. 534; Gardiner v. People, 6 Park. Crim. Rep. 201; Anderson v. State, 147 Ind. 452. (2) The State's instructions were full and complete, and certainly very liberal towards the defendant. Defendant cannot complain of the failure of the trial court to fully instruct the jury, even if there was such a failure, as he has not complied with the recent ruling of this court on said subject. State v. Bond, 191 Mo. 555. There was no error in submitting to the jury the question of defendant's knowledge of the official capacity of the deceased. Not only did the State prove by several wit-

nesses that defendant knew deceased, knew the office that he was then holding for the second term and lived in the same town with him; but defendant, a number of times, in his testimony in chief, speaks of him as "Sheriff Polk" and "the sheriff." And defendant's counsel never thought of such an issue being in the case, as they prepared and offered instructions 5, 7 and 8, in which the deceased is similarly referred to. It is fundamental that a case must be tried in the appellate court on the same theory upon which it was tried in the lower court; and a party cannot, on appeal, shift his position. State v. Whitmore, 147 Mo. 78; Fry v. State, 81 Ga. 645; Elliott on Appellate Proc., secs. 491, 492. If defendant knew of the official character of deceased, then there was nothing to reduce the crime to manslaughter or murder in the second degree. State v. Grant, 76 Mo. 247; State v. Cushenberry, 157 Mo. 181; State v. Duncan, 116 Mo. 312; State v. Collins, 181 Mo. 261; State v. Rudolph, 187 Mo. 91.

GANTT, J.—On June 9, 1905, the prosecuting attorney of Iron county filed an information, duly verified by his affidavit, wherein he charged the defendant William Spaugh, Jr., and Mary E. Spaugh and Arthur Spaugh with murder in the first degree, of one John W. Polk, in said county of Iron on the 25th day of May, 1905. The information was in four counts; the first count charged that the mortal wound was inflicted with a shot gun; the second count that the mortal wound was inflicted with a rifle; the third charged that the mortal wound was inflicted with a revolving pistol, and the fourth charged that the mortal wound was inflicted with a shot gun and rifle and a pistol.

On the application of the defendant a change of venue was granted from Iron county to Reynolds county on the ground of prejudice of the inhabitants of Iron county against the defendants.

At the November term, 1905, of the circuit court of Reynolds county, the defendants filed a motion to quash the information on various grounds, which motion the court overruled.  In this court the information is not assailed, but it has been carefully examined and it is in the approved form and sufficient, and we deem it unnecessary to encumber the record with a reproduction of it.

On the 29th of November, 1905, Arthur Spaugh, one of the defendants, prayed for a severance, and it was granted.  At the same term, the defendants William Spaugh, Jr., and Mary E. Spaugh were jointly tried, and the defendant was convicted of murder in the first degree, and Mary E. Spaugh of murder in the second degree.  A motion for new trial was sustained as to Mary E. Spaugh, but overruled as to the defendant.  The defendant also filed a motion in arrest, which was heard and overruled.  Thereupon the defendant was sentenced to be hanged on the 16th of February, 1906.  From that judgment and sentence he has appealed to this court.

No objections or exceptions were taken to any of the jurors.

On the part of the State the evidence tends to show that Mary E. Spaugh is the wife of William Spaugh, Sr., and the mother of the defendants, William Spaugh, Jr., and Arthur Spaugh, and that William Spaugh, Sr., and his family, consisting of his wife and two sons, lived in the town of Ironton in Iron county, a short distance from the Iron Mountain depot in said town, on the 25th day of May, 1905.  It also appeared in the evidence that the deceased, John W. Polk, was the sheriff of Iron county, and was serving a second term in said office at the time that he was shot and killed in the house of William Spaugh, Sr., on the 25th of May, 1905.  The evidence also discloses that the sheriff and his family occupied the residence attached to

the county jail in said town, and that the jail was not far from the Spaugh home. The evidence shows beyond all controversy that the defendant and the other members of the Spaugh family all knew the deceased, John W. Polk, and knew that he was sheriff of the county. On May 25, 1905, William R. Edgar, Jr., a young man of seventeen, a resident of Ironton, with two other young men, went to Rascher's restaurant, in the north end of Ironton, and while there were listening to a graphophone. In a short time the defendant William Spaugh came into the restaurant, and asked Rascher to have it play a lively piece, and when the graphophone began to play that time, the defendant started to dance around the room, and he circled past the Edgar boy, threw his arms around him, trying to make him dance. Edgar pulled loose from the defendant, and told him to stop his foolishness and went away and sat down on the side of a round table in the room, and Rascher started to change the piece on the graphophone; thereupon the defendant said, "If you are mad, you can find me, if you want trouble with me," to which Edgar made no reply but continued his conversation with Rascher about the graphophone. Defendant then walked up behind Edgar and said to him: "The more I look at you, the worse I hate you; I am tired of your G—— d———— looks." Whereupon Edgar turned his head toward defendant and said, "Why, Bill, what have I ever done to you?" and defendant said, "I have got a notion to knock the G—— d———— head off of you," and as he made that remark, he struck Edgar over the eye, knocking him over on the table on his side, and struck him several times on the back and then caught him up by his feet and jerked him off of the table. At this point Rascher interfered and prevented further trouble. Edgar got out of the door of the restaurant and ran down to the depot, which was near by. At the depot he got some water and washed the blood

off of his face, and requested the station agent to notify the town marshal. After Edgar left the restaurant, Rascher, at the request of the defendant, William Spaugh, Jr., sent a telephone message to George Schultz to tell Brown to come to Spaugh's house. Edgar went to the office of Doctor Marshall, where his wound was dressed. Dr. Marshall testified that the eye-brow was cut through and that the wound was about one and one-half inches long and extended down to the skull. It was an incised wound caused by some sharp instrument. The wound or the skin healed together in about a week, but pus formed down next to the bone and the abcess formed there had to be opened.

Mr. Downey, the station agent, called up the telephone operator at the central station and asked to have the marshal sent down to the station. In about twenty minutes the sheriff came to the depot and asked the agent what the trouble was, and was told that Edgar had reported that Spaugh had hit him. When the sheriff came out of the depot, he met Ernest Rieke and asked him how it was and how it happened and Rieke told him about the encounter in the restaurant and told the sheriff that he thought Edgar's eye was put out and he was bloody all over his face, and told the sheriff that Spaugh had gone down the street afterwards toward his home. Thereupon the sheriff left and went to the Spaugh home. The deceased was seen by several witnesses as he approached the Spaugh home, and was seen to stop at the front gate, which was only a few steps from the house. The evidence on the part of the State further tended to prove that William Brown received the telephone message to go to the Spaugh home and went directly there, and was in the yard of the Spaugh premises just before the sheriff came to the gate, and heard defendant and his mother and his brother Arthur talking on the front porch of their home. Defendant told his mother and brother

that he had had some trouble with Edgar's boy up in town at a restaurant; that the Edgar boy was flipping pea-nut hulls at him, and that he went up and told Edgar he was going to knock h—— out of him, and that he had knocked h—— out of him. Defendant went on to say that the Edgar set had prosecuted him, had done him dirt, and he would kill whoever came to arrest him, and that he would let no one take him; that Arthur and the mother joined in this conversation approvingly, the mother saying that she would not let any one take them, but would kill whoever came after them. The evidence tended further to show that from this porch a person could easily see all the street as far down as the depot, and that the witness William Brown did see the sheriff as he walked that distance. As the sheriff walked up towards the Spaugh residence, Arthur Spaugh and his mother got up and walked from the porch into the kitchen and told the defendant to come in, but defendant replied, "I guess I know my business." When the sheriff reached the gate, he called to the defendant to come out there and defendant replid, "Have you got a warrant?" to which the sheriff answered, "Never mind what I have got, come on out here." Thereupon the defendant got up and walked off of the porch and into the kitchen. The sheriff opened the gate and walked quickly towards the house and up on the porch. Brown testified he heard some one in the house say, "Stop," and some one else say, "Kill him," and on looking in at the kitchen door, he saw the defendant backing towards the bed-room door, saw a gun pointed towards the sheriff and then heard several reports from a gun. Other witnesses testified to hearing four shots fired from a shotgun, and others from a rifle, and all fired in rapid succession. Brown went around the house and started towards the rear of the premises and met the father of the defendant coming from the stable or garden. In a few min-

utes defendant and his brother were seen running out of the house going towards the back part of the place, each carrying a gun. They stopped, discharged the empty shells from their guns, and re-loaded. Their mother was with them and ran along with them for a short distance, then stopped and pointed to them to go toward Shepard's Mountain. As they ran a negro named Len Arnett came running from the direction of Rascher's restaurant, and defendant leveled his rifle and fired one shot at him; the bullet missed Arnett and struck the side of Rascher's house. Arthur and William Spaugh continued their retreat towards Shepard's mountain and the mother returned to the kitchen.

News of the shooting spread rapidly through the town, and citizens and officers soon arrived at the Spaugh home. The dead body of Sheriff Polk was found lying on the floor of the kitchen in a pool of blood; his face was toward the floor and his coat tail raised just above the hip pocket. No weapon was found on the deceased, but his empty scabbard was in his hip pocket. His head was close to the door, which was directly in front of the gate through which he had entered the yard, his left hand under his face and his right hand under his body. There were four wounds on his body, as follows: A gun-shot wound which entered about three inches below the right shoulder blade and five inches from the back bone, and penetrated the lungs and liver. Another gun-shot wound entered the head two inches above the right ear, passed through the brain and lodged between the left eye and left ear. Another gun-shot wound entered the body under the left arm; it was three inches square and cut the heart loose from its tendons, passing through the left lung and carrying the gun wadding and parts of deceased's suspenders into the wound and up next to the back bone. Another wound was made by a shotgun, which the physician testified must have been within three feet of the deceased's body, at the time it was fired.

In addition to these shotgun wounds an incised wound was found on the top of the head of the deceased made by some sharp instrument, which laid bare the skull. Any one of these wounds was sufficient to have produced instant death.

Testimony on the part of the State tended to prove that the mother was in the room where the dead body lay and when the witnesses arrived she was busy getting supper ready, brushing off the dining table and spreading the table cloth. The body of the dead sheriff lay on the floor, his head being within a foot and a half of the cook stove; as Mrs. Spaugh walked around the room she stepped over the body of the deceased, apparently unconcerned at what had happened. She was arrested and placed in jail, but the defendant William Spaugh and Arthur his brother fled from the town and were not arrested for six days.

The town marshal, John I. Marshall, who is also constable of that township, formed a posse and made diligent search for defendant and his brother, hunting for them day and night for about six days. After six days' search the defendant William Spaugh and his brother Arthur were located in a deserted cabin in Madison county, and the newly appointed sheriff, John I. Marshall, and a posse surrounded this cabin one morning about daylight. As soon as the fugitives saw that the officers were near them, they opened fire and a battle between the sheriff and the posse on one side and the defendant and his brother on the other side, ensued, which lasted about thirty minutes, some fifty shots being exchanged. In this battle Arthur Spaugh was wounded on the arm, and he called to the sheriff that they would surrender if the posse would not kill them. Upon being assured by the sheriff that they would not be hurt, the defendant and his brother held up their hands and surrendered to the officers. In this posse was Dr. Barnhouse, and the sheriff requested him

to dress the wound on Arthur Spaugh's arm, which he did; while thus engaged, Arthur asked Dr. Barnhouse why they had his mother in jail and on being told that she was charged with having participated in the killing of Sheriff Polk, Arthur said: "We killed John Polk, and mother did not have anything to do with it. I shot at him the first shot and missed him, and the next shot I hit him." Defendant spoke up and said: "I shot him in the head." When asked why they had shot the sheriff they both said: "They had come to the conclusion that they had been arrested a good many times and that they would not be arrested any more; that the sheriff had come up there to arrest them, and they were not going to be arrested." When asked what the sheriff did, they said: "He did not do anything, and we did not give him time to do anything. The damn son-of-a-bitch will never arrest us again." On the way to Ironton defendant said that Sheriff Polk had come up there to arrest him and he was not going to be arrested; that Arthur shot Polk once and defendant shot him once. Defendant further said that he hit deceased over the head with his Winchester rifle and bent the barrel.

At the time of their arrest defendant William Spaugh and his brother Arthur had in their possession a double-barrel shotgun, some loaded shells, a Winchester rifle, some cartridges and some dynamite caps. The defendant and his brother were placed in the county jail in Ironton and Thomas Sharp, the deputy sheriff of Madison county, visited them the same day. Mr. Sharp asked the defendant how he happened to kill the deceased and he replied that he was "egged up to do it," and when asked who did it, defendant said: "We both of us did it, one of us used a shotgun and the other a Winchester."

The next day Dr. Marshall was taken by the sheriff to the jail to dress the wound on Arthur Spaugh's

arm, and in the presence of defendant had a conversation with Arthur in which Dr. Marshall said, "I am sorry you boys killed Sheriff Polk," and Arthur replied, "I am sorry that we killed him too."

The State's evidence further showed that in October, 1904, one Henry Trammel had been fined for some misdemeanor and served some time in jail. In going home, this witness, passed the Spaugh residence and had a conversation with Mrs. Spaugh in the presence of defendant and his brother. Mrs. Spaugh expressed indignation at the way the witness had been treated and said: "If I was you and William and Arthur I would take my gun down and kill every one of them darned officers. If you had the spunk that I have, you would do it."

On behalf of the defendant the evidence tended to prove that defendant William Spaugh had a difficulty on May 25, 1905, with the Edgar boy at Rascher's restaurant, and that he went home and reported the same to his mother, who agreed to loan him the money to pay his fine; that in a few moments, Arthur Spaugh and William Brown came and sat down on the porch beside the defendant. Presently the defendant saw Sheriff Polk coming down the street and supposed he was coming to see about this trouble; that the sheriff called to the defendant from the gate and told him to come out there and defendant asked if he had a warrant, but the sheriff declined to say what he had; that defendant got up to go into the house to get the money from his mother when he heard the sheriff coming up on the porch and looking around saw that the sheriff had a pistol drawn on him; that the sheriff fired once at the defendant but missed him, although only two and a half feet away; that the defendant then ran out of the kitchen door into the back yard when he heard several shots fired; that he did not see any of the shots fired, but was close to the door at that time; that Arthur

Spaugh came to the kitchen door and handed defendant a Winchester rifle, and said, "Let's go," and defendant took the rifle and started over the hill with his brother. Defendant denied that he shot Sheriff Polk and said that he did not know that he was killed until he got on top of Shepard's mountain. That, fearing that he would have trouble, defendant ran off with his brother. Mrs. Spaugh testified that she took no part in the killing of the deceased, and had not stepped over his body, nor continued to look after the preparation of supper after she found that he had been killed. She denied making any threats in the presence of the State's witnesses, Henry Trammel and William Brown; and denied making the admissions testified to by the State's witnesses.

I. The defendant assigns various grounds for the reversal of the judgment of the circuit court and they will be examined and considered in the order of the brief of the counsel for the defendant.

It is insisted that the circuit court should have directed a verdict of acquittal at the close of the State's case, for the reason that there was nothing in the evidence to show that the defendant killed the deceased, or had anything to do with the killing other than that he was in the room when the deceased was shot, and there was no evidence of a conspiracy or common design on the part of Arthur Spaugh and the defendant William, and we are referred by the learned counsel to Green v. State, 13 Mo. 382, and State v. Walker, 98 Mo. 95, but these two cases but announce the well-settled doctrine that a conspiracy can seldom be shown by direct and positive evidence, but may be inferred from the circumstances attending the commission of an offense, and that it is for the court in the first place to determine whether there is any evidence of a conspiracy, and for the jury to determine whether there was one and its objects, and that where a conspiracy is es-

tablished the act or declaration of one in the prosecution of the common undertaking is the act or declaration of all. In view of the conversation between the defendant and his brother Arthur, and his mother, just prior to the homicide on the porch of the Spaugh home, and of the retreat within the house by these three when the sheriff was seen approaching the house, and of the expression overheard by Brown of "kill him" when the sheriff reached the door, and of the firing of at least four shots within the room, some from a shotgun and others from a rifle, and of the retreat from the house by Arthur and the defendant, each armed with a deadly weapon, immediately after the shooting of the sheriff, and their secreting themselves together in a deserted cabin in Madison county, and their jointly resisting arrest by the sheriff and his posse, it would seem to be too plain for discussion that there was ample evidence of a conspiracy and of a common unlawful purpose to kill the sheriff if he attempted to arrest the defendant. [1 Bishop's Criminal Law, sec. 634; Wharton's Criminal Evidence, sec. 698; State v. William Walker, 98 Mo. l. c. 104; State v. Orrick, 106 Mo. l. c. 120, 124.]

But the State's case as against the defendant does not rest alone upon the evidence of the common criminal design and conduct of the defendant and Arthur Spaugh, for there was ample evidence tending to show that the defendant anticipated an arrest by the sheriff on account of his criminal assault upon young Edgar, and in view of such arrest, he declared to his mother and Arthur, in the presence and hearing of Brown, that he would kill whoever came to arrest him, and when the sheriff reached the gate of the Spaugh home and defendant was directed by the sheriff to come out to him, the defendant himself called to the sheriff and inquired if he had a warrant for him, and instead of obeying the command of the sheriff to come out to the

gate, went immediately into the house, and when the
sheriff reached the room at least four shots were fired,
some from a shotgun and others from a rifle, all of
which took effect in the body of the officer, any one of
which was sufficient to cause the death of the sheriff,
and immediately after this shooting, the defendant
himself, armed with a shotgun or a rifle, fled from the
house to escape arrest; and if anything were wanting
in view of all of this evidence to show the defendant's
participation in the homicide, it was furnished by the
defendant's own statement after the arrest in Madison
county while Dr. Barnhouse was dressing Arthur
Spaugh's arm, that he, defendant, shot the deceased
in the head, giving as his reason why he shot him, that
he had been arrested a good many times and had come
to the conclusion not to be arrested any more, and when
asked what the sheriff did, he joined in the statement
of his brother Arthur, "He did not do anything, and
we did not give him a chance to do anything. The
d— son of a b— will never arrest us again." And on
the way to Ironton after they were arrested, defendant
further said that Sheriff Polk had come up there to ar-
rest him and he was not going to be arrested; that Ar-
thur shot the sheriff once and he, defendant, shot him
once, and that he, defendant, hit the deceased over the
head with his Winchester rifle and bent the barrel.
Defendant also stated to Sharp, while in the county
jail at Ironton, when asked who did it, that "We both
did it, one of us used a shotgun and the other a Win-
chester." So that irrespective of any question of con-
spiracy, there was abundant evidence to go to the jury
tending to show that the defendant himself was the
slayer of the deceased and the perpetrator of the crime
for which he was on trial. The court committed no
error in refusing to direct an acquittal of the defendant
at the close of the State's case.

II.  It is next insisted for the defendant that the circuit court erred in admitting the evidence as to the difficulty which took place   at the restaurant between the defendant and William R. Edgar, Jr., some twenty-five minutes before the alleged killing, for the reason that it was a separate and distinct crime in no way connected with the murder.   There is no doubt that it is a general rule of criminal law in this State that evidence of separate and isolated crimes cannot be given against one on trial for a specific crime, but it is equally well established in this State that proof of another crime than the one for which the defendant is on trial is competent to prove the specific crime charged when it tends to establish the motive, intent or absence of mistake or accident or the identity of the person charged with the commission of the crime on trial. [State v. Collins, 181 Mo. l. c. 260, 261.]

In State v. Bailey, 190 Mo. 280, as well as in State v. Collins, supra, we had occasion to cite and approve the doctrine as laid down in People v. Molineux, 168 N. Y. 264, and we reached the conclusion in the Bailey case that evidence which was illustrative of the principal act in the tragedy and a part of the system of criminal acts so connected together that each tends to establish the guilty intent, design and purpose of the other, was competent.   In this case the assault by the defendant upon young Edgar illustrates and demonstrates the motive which defendant had in shooting the deceased.   It is so interwoven and blended with the conduct of both the defendant and the deceased that the presence of the sheriff at the home of the Spaughs and the conduct of the defendant in shooting the sheriff at that time, cannot be understood without that testimony.    In a word, it furnished proof of the motive which actuated the defendant in firing the fatal shot, and, as held in State v. Collins, 181 Mo. l. c. 261, whenever proof of motive is an essential ingredient of the

evidence against the defendant in a criminal trial, and proof of another crime tends to establish that motive, then it is competent evidence, notwithstanding it tends to show a distinct criminal offense. In State v. Nugent, 71 Mo. 1. c. 143, it was said by this court: "If the fact of the commission of a former crime has no tendency to prove the commission of the one for which the accused is on trial, or any essential ingredient of the latter, it is of course inadmissible for any purpose, and this is as far as any case has gone in that direction. But if the commission or attempt to commit another crime tends to establish the commission of the crime in question, or any fact which is one of its constituent elements, it is admissible, just as any other evidence to establish that fact, and the State cannot be deprived of such evidence because it proves the accused guilty of another and distinct offense. [See, also, State v. Rider, 95 Mo. 485; Com. v. McConkey, 101 Pa. St. 516; State v. Wintzingerode, 9 Or. 153.] There was no error in admitting the evidence as to the assault by the defendant upon Edgar, a few minutes before the shooting of the sheriff, and the evidence that the sheriff had been told by the witness Rieke of the assault by the defendant upon young Edgar, and that the witness thought defendant had put out Edgar's eye, and that his face was all bloody, etc.

Neither was there any error in permitting the State's witness Baldwin to testify that he reported to Sheriff Polk that there was trouble and he was wanted at the depot. The only objection made to this witness's testimony was that it was incompetent, which we have often held amounts to no objection whatever. But even if a proper objection had been made, it should have been overruled, for the reason that it was perfectly competent for the State to show that the sheriff had reasonable cause to suspect that a felony had been committed and hence his authority to

arrest the defendant without a warrant. In State v. Underwood, 75 Mo. l. c. 237, the court quoted with approval the doctrine announced by C. J. SHAW in Com. v. Carey, 12 Cush. 246, as follows: "If a constable or other peace officer arrest a person without warrant he is not bound to show in his justification a felony actually committed, to render the arrest lawful; but if he suspects one on his own knowledge of facts, or on facts communicated to him by others, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest is not unlawful." Bishop, speaking on arrest without warrant, 1 Bishop's Criminal Procedure (3 Ed.), sec. 181, says: "Where it is felony or treason, and is past, the distinction between the powers of the officer and the private person is this: should the one arrested be found not to be guilty, the private person will not be justified unless an offense had been committed by some one; while the officer is justified though no offense had been committed; yet both must have had reasonable cause to suspect the one apprehended." The learned author in section 182, further says: "If a third person charges one to an officer with having committed a felony, this will ordinarily, as we have seen, justify and even require his arrest by the officer." [State v. Cushenberry, 157 Mo. l. c. 181.]

III. It is insisted that the circuit court erred in admitting in evidence certain statements or confessions made by the defendant to Thomas Sharp and Dr. Barnhouse, for the reason that the confession to Sharp was to an officer after the arrest of the defendant and while he was in the Iron county jail, and the confessions made to the other two witnesses were made immediately after the arrest and capture of the defendant while he was suffering from wounds. In each instance the trial court excluded the jury and passed upon the

preliminary questions as to whether these confessions were voluntary.

The rule as to admissibility of confessions by a defendant has been long established in this State. In State v. Patterson, 73 Mo. 695, the subject received an exhaustive examination by this court and the doctrine was announced that a confession is presumed to be voluntary unless the contrary is shown. In order to exclude evidence of a prisoner's confession, it must appear affirmatively that some inducement to confess was held out to him by or in the presence of some one having authority. In the case at bar, there was evidence on the preliminary examination that no inducements were held out to obtain a confession by the defendant and unless there was error in admitting the confession it is no ground for reversal of the judgment. As to the confession made to Sharp, it is clear that Sharp was not the officer in charge of the defendant and had no authority to make any promises of leniency to the defendant. It was ruled in State v. Patterson, 73 Mo. 695, that "a confession to be inadmissible must be made to an officer of the law, in consequence of improper influences exerted by him, and if no threat of harm or promise of worldly advantage be made by such official, or by the master of the accused when directly concerned, the confession is admissible;" and in State v. Jones, 171 Mo. l. c. 406, it was said: "It has never been ruled that merely because the defendant concluded to testify that his confession was obtained by duress or promise of immunity, the confession must be excluded." [State v. Brennan, 164 Mo. 487; State v. Hopkirk, 84 Mo. 278.] As to the conversations with Dr. Barnhouse and Dr. Marshall, the defendant began the conversations himself and made the statements of his participation in the killing of the sheriff without any promises being made or threats of violence.

IV. During the trial Robert Rascher, the witness for the State, after testifying to the assault by the defendant upon young Edgar, testified further that he took hold of defendant and pushed him out of the door, and that defendant kicked him. This all occurred immediately after the assault on the Edgar boy, and in the attempt of Rascher to prevent further injury to the boy by defendant.

Defendant's counsel objected to the testimony in regard to what occurred between Rascher and the defendant at that time, but assigned no reason for the objection; a few minutes later, however, the trial court of its own motion concluded that the evidence as to the defendant kicking Rascher was objectionable, and instructed the jury that this evidence was withdrawn and that they should disregard and not consider the same. This is now assigned as error by the defendant. This evidence of the defendant kicking the witness was so intimately connected with the assault on Edgar that it should be treated as a part of the *res gestae,* but it is unnecessary to hold that it was, inasmuch as the most that can be said of it is that it was simply irrelevant and clearly was not so prejudicial as to work any harm to the defendant, in view of the fact that the court of its own motion promptly withdrew it and instructed the jury to disregard it.

V. Defendant also complains that the court permitted the prosecuting attorney, Mr. Damron, to explain why William Brown, a witness for the State, was arrested immediately after the killing of John W. Polk. It appears that when Brown was on the stand he was cross-examined by defendant's counsel and the fact elicited that he had been put in jail the day of the homincide and released about one o'clock, and that afterwards he was put in jail and kept about one-half a day and then released, and again put in jail, and he gave a sworn statement. The trend of this cross-examination

was to impress the jury that Brown had been arrested
on the charge of the murder and released provided he
would testify against the defendant, and the prosecut-
ing attorney went on the stand and explained how
Brown came to be put in jail and denied that he was
ever put in there on the charge of the murder of Sheriff
Polk, and he testified that no inducements or reward
were held out to Brown to get him to make the state-
ment and no threats made to him.   The defendant hav-
ing assailed the testimony of Brown and sought to
create the impression that his evidence was improperly
obtained, we can see no valid reason why the prosecut-
ing attorney should not have been permitted to rebut
such a charge, nor how the explanation of the prosecut-
ing attorney could have prejudiced the defendant.

VI.   It is also made a ground of complaint that the
court permitted the State to show that immediately
after the killing of the sheriff, the defendant and his
brother Arthur armed themselves and fled to the moun-
tains and for six days evaded arrest and when finally
located in Madison county they resisted to the utmost,
and when captured had in their possession a shotgun,
a Winchester rifle, a revolver and a quantity of am-
munition, on the ground that this evidence could only
tend to arouse the prejudice of the jury, and that the
pistol and dynamite cartridges were not shown to have
been used, or in any way connected with the crime.

That the flight of one charged with a crime may be
shown as an evidence of guilt is no longer open to
doubt.   In State v. Moore, 101 Mo. 330, Judge SHER-
WOOD, speaking for this court, said: ''Flight, escape
or attempt to escape, or to effect prison breach, all con-
stitute legitimate evidence, where the guilt of the party
on trial is in question.   How much weight it is to pos-
sess depends, of course, upon the individual circum-
stances of each case.   [Wharton's Cr. Ev. (9 Ed.), sec.
750; State v. Williams, 54 Mo. 170; State v. Jackson,

95 Mo. 623; 1 Bishop's Cr. Proc., sec. 1250.]'' In Jamison v. People, 145 Ill. l. c. 376, 377, the Supreme Court of Illinois said: ''It has, therefore, been held perfectly competent for the prosecution to prove an attempted escape of the accused. Upon the same principle, acts of the accused by way of resisting or preventing arrest may be shown.'' In State v. Shaw, 73 Vt. l. c. 154, the Supreme Court, speaking of the flight of an accused, said: ''As the probative force of such testimony may be lessened or wholly taken away by evidence on the part of a defendant tending to explain such flight upon some theory other than that of guilt of the crime charged, it is proper to show the extent of the flight, together with the actions and the doings of the defendant that tend to characterize it, including resistance of known officers in attempting his arrest.'' Indeed, this is the doctrine of the courts of last resort in many of the States. [Com. v. Biddle, 200 Pa. St. 647; State v. Phillips, 118 Iowa l. c. 666; People v. Fredericks, 106 Cal. 554; People v. Flannelly, 128 Cal. 87; Bowles v. State, 58 Ala. 335.]

And on the like principle it was not error to permit the State to show that very soon after the homicide and as defendant was escaping he shot at the negro Arnett who was running towards him. The defendant obviously suspected the negro was pursuing him. [State v. Sanders, 76 Mo. l. c. 36; State v. Vinso, 171 Mo. 587.] It was admissible not for the purpose of showing an additional crime, but as an indication of their guilt of the crime for which they were on trial. There are some other objections to testimony but they are not seriously insisted on and they were none of sufficient importance to work a reversal at any event.

VII. The instructions given by the court are assailed. The instruction on reasonable doubt is criticised. That instruction was in the following form: ''4. You are instructed that the law presumes the in-

nocence and not the guilt of the defendants and this presumption attends them throughout the trial and at the end entitles them to an acquittal unless the evidence in the case when taken as a whole satisfies you of their guilt beyond a reasonable doubt. You are, however, instructed that a reasonable doubt of the guilt of the defendants which would warrant you in acquitting them on the ground of your having such reasonable doubt of their guilt should be a substantial doubt of their guilt upon a full and fair consideration by you of all the evidence, facts and circumstances in the case and not a mere possibility that they may be innocent.'' The cases of State v. Clark, 147 Mo. 20, and State v. Fannon, 158 Mo. 149, do not in the least sustain defendant's criticism of the instruction on reasonable doubt in this case. It has often been approved by this court and is entirely sufficient.

VIII. It is next insisted that the trial court erred in failing to instruct the jury in relation to defendant's knowledge of the official character of the sheriff. Indeed, this is one of the most important propositions arising upon this record. Unquestionably it is the law of this State that if a defendant slay an officer of whose official character he has no notice, it is homicide in self-defence, if the killing was apparently necessary to save the defendant's life. [State v. Underwood, 75 Mo. l. c. 238.] In Wharton's Crim. Law, the learned author lays down the doctrine on this subject, as follows: ''Nor should it be supposed that this exemption from distinctive liability, in cases where the officer's official character is not known, is founded in technical reasoning. Not only is it essential to the rights of the citizen that he shall be required to submit to arrest only when the official character of the demand is made known to him, but it is essential to the dignity of the State that its servants should be sheltered by these official prerogatives only when they are acting legally, and give no-

tice that they so act." [1 Wharton's Crim. Law (10 Ed.), secs. 419, 648.] And this statement of the law met the approval of this court in State v. Grant, 76 Mo. l. c. 247, and State v. Underwood, 75 Mo. 238; State v. Bateswell, 105 Mo. 609. In each of these cases there was a plain and distinct issue as to whether the party resisting arrest was informed of the official character of the officer and of his intention to make an arrest. Where such is the case it is unquestionably the duty of the court to submit the question of the knowledge of the defendant of the official character of the officer and his right to make the arrest. [State v. Underwood, 75 Mo. 238; State v. Bateswell, 105 Mo. 609.]

Was there any such issue in this case? On the part of the State the testimony divulged that the deceased, John W. Polk, was the sheriff of Iron county, and at the time he was killed by defendant was serving his second term as such officer. He was living in the same town, Ironton, with the defendant, and only a short distance from defendant's residence, and when the deceased reached the gate of the Spaugh home, he addressed defendant and said, "Come out here Will." Whereupon defendant said to him, "Have you got a warrant?" In addition to this clear recognition of the mission of the sheriff, after his arrest the defendant stated to different witnesses for the State that he and his brother had killed "Sheriff Polk" and his mother had nothing to do with it. But the defendant was a witness on the stand in his own behalf, and he was asked by his counsel: "Did you see Sheriff Polk while you stood on the porch?" Ans. "Yes, sir." Q. "Where was Sheriff Polk when you first saw him?" Ans. "Coming up from the depot." Q. "What did the sheriff say to you when he arrived at the gate?" Ans. "He told me to come out there, that he wanted to see me, and I says, 'Have you got a warrant for me?' and he says, 'It don't make any difference what I have got,

come out here.''' He further testified that he then went
into the house and asked his mother to get a twenty-
dollar gold piece she had and she said she would let
him have it to pay the fine. He further stated he was
in the room with ''Sheriff Polk'' when the first shot
was fired. All through his testimony he and his coun-
sel alluded to and spoke of the deceased as ''Sheriff
Polk'' whom he knew. In a word, both the State and
the defendant assumed throughout the trial that de-
fendant knew deceased and knew he was sheriff of Iron
county, and the defendant himself testified to his at-
tempt to get the money to pay his fine to the sheriff for
the assault on Edgar. But this is not all. In the in-
structions asked for defendant, his counsel assumed and
told the jury that John W. Polk, the deceased, was the
sheriff of Iron county. They conceded this but claimed
that as sheriff he had no right to make the arrest be-
cause the offense against Edgar was a misdemeanor
or committed out of the presence of the sheriff, and the
sheriff had no right to make the arrest without a war-
rant. Nowhere did counsel for defendant ask the court
to submit the issue of defendant's knowledge of the
official character of deceased to the jury, but on the con-
trary assumed that defendant knew, as all the evid-
ence on both sides demonstrated he did know, that
deceased was the sheriff of the county and was present
to arrest him when he shot him. Having tried this case
on the theory that the deceased was the sheriff and that
defendant knew his official character and that deceased
had come to his home to arrest him, the defendant can-
not now put the circuit court in error by shifting his
position and insisting that the court erred in not sub-
mitting an issue which both sides conceded was not an
issue but an admitted fact throughout the trial. [State
v. Whitmore, 147 Mo. l. c. 84.] Under repeated ad-
judications of this court it would not have constituted
error if the circuit court in an instruction had assumed

that defendant knew deceased was the sheriff of Iron county and had come to his home to arrest defendant. [State v. Moore, 101 Mo. l. c. 329; Taylor v. Iron Co., 133 Mo. 349; Pope v. Railroad, 99 Mo. 400; Elliott on App. Proc., secs. 489, 491.]

IX. It is insisted that the circuit court erred in not giving the defendant's instructions numbered 1, 2, 3 and 5, for manslaughter in the fourth degree. That the defendant knew the official character of the deceased and that he was the sheriff of Iron county there can be no doubt whatever. Neither does the evidence leave any doubt that he knew the deceased had come to arrest him for the assault committed which defendant had made upon Edgar. Neither does the evidence leave any doubt that he apprehended that the sheriff had come to arrest him for the assault. Whether the defendant was entitled to an instruction for manslaughter in the fourth degree must be resolved by a consideration of the respective rights of the sheriff and defendant when the sheriff went to the home of defendant to arrest him. That the sheriff was there on that mission the testimony abundantly established. He had been called upon by the agent of the railroad and had responded and met Rieke who told him that defendant had assaulted young Edgar and he thought had put his eye out, and that Edgar's face was covered with blood.

By section 1846, Revised Statutes 1899, it is made a felony for any person on purpose and with malice aforethought to put out an eye and this constituted mayhem at common law. It is the settled law of this State that a sheriff or constable does not need a warrant to justify him in making an arrest if he has reasonable cause to suspect that a felony has been committed by the party he seeks to arrest. Blackstone, speaking of a constable, says: "He may, without warrant, in case of felony actually committed . . . upon probable suspicion, arrest the felon." [4 Bl.

Com. 292.] And this court, in State. v. Underwood, 75 Mo. l. c. 237, adopted the doctrine announced by C. J. SHAW in Com. v. Carey, 12 Cush. 246, that a sheriff if he suspects from his own knowledge of facts, or from facts communicated to him by others, has reasonable ground to believe that the accused has been guilty of felony, he may arrest him. . And this is the doctrine laid down by Bishop. [1 Bishop's Crim. Proc., sec. 181.] In view of the fact then that Sheriff Polk, the deceased, had been called upon as a peace officer, and had .been informed by Rieke that the defendant had assaulted and put out young Edgar's eye, it is clear that he had a reasonable ground of suspicion that the defendant had committed a felony, and he was fully within his lawful duty as a sheriff in attempting to arrest the defendant, and defendant knowing that he was a sheriff of the county and as his whole testimony shows apprehension that the deceased had come to arrest him for the assault upon Edgar, in the language of this court in State v. Cushenberry, 157 Mo. l. c. 181, ''there was and could be no such thing as 'just cause or provocation' or 'heat of passion or on sudden provocation,' and consequently no necessity for defining these terms; because in such cases to resist an officer 'passion is wickedness and resistance crime.' '' [State v. Duncan, 116 Mo. l. c. 312; State v. Craft, 164 Mo. 653, 654.] There was therefore no error in the refusal of the court to instruct on manslaughter in the fourth degree.

But there is another equally conclusive reason why the court should not have instructed on manslaughter; because the defendant did not pretend that he shot and killed the deceased on account of any lawful provocation and in the heat of passion; on the contrary, he testified that he did not shoot the deceased, made no threats against his life and did not know that the sheriff had been shot until sometime after the shooting. The is-

sues presented to the jury by the State and the defendant were two and two only, that of the State tending to show a deliberate and premeditated murder of a peace officer by the defendant, and that of the defendant that he had nothing whatever to do with the killing of the deceased. And under these circumstances there was no ground for an instruction on the law of manslaughter.

X. It is also urged that the court erred in giving an instruction for murder in the first degree, for the reason that the evidence shows a lack of the element of deliberation. This objection, we think, is without merit, when the evidence of the witness Brown as to the threats of the defendant that he intended to kill anyone who attempted to arrest him, and his conduct in retreating into the room and arming himself with a deadly weapon and in shooting down the officer who had come to arrest him for an offense which he knew he had just recently committed, is considered. The evidence tends to show that he had ample time to deliberate and to form the conscious purpose and intent to kill the officer and gratify the feeling of revenge which he had expressed to his mother and brother prior to the killing of the officer who came to arrest him.

As to the objection to the giving of an instruction for murder in the second degree, it is sufficient to say that the defendant is in no position to complain of that instruction because he was not convicted of that crime, and the instruction was more favorable to him perhaps than it should have been.

Exception is also taken to the definition of the word "deliberately" in the first instruction, because it is said that it does not properly define violent passion. The court instructed the jury that deliberately meant: "In a cool state of blood. It does not mean brooded over, considered, reflected upon for a week, a day or an hour, but it means an intent to kill executed by a person not under the influence of violent passion sudden-

ly aroused by some unlawful provocation, but in furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful act. And the passion here referred to is that only which is produced by what the law recognizes as a just or lawful cause of provocation.'' This definition of the word ''deliberately'' is in exact conformance to the ruling of this court in State v. Fairlamb, 121 Mo. l. c. 146, and many cases cited in the opinion in that case, and has often been approved since then, and there is no error in it.

The objection to instruction numbered 2 is that it authorized the jury to convict the defendant on evidence that was given against Arthur Spaugh, his co-defendant, but the instruction is not obnoxious to the criticism; it only permitted the jury to find the defendant guilty if he and his brother willfully, deliberately and premeditatedly and of their malice aforethought did each with a gun, that is to say, one of them with a shotgun and the other of them with a Winchester rifle, or one with a shotgun and the other with a pistol, shoot and kill John W. Polk. By this instruction the defendant was held responsible for his own act and the murderous act of his brother committed jointly with the defendant.

XI. Within the four days after the rendition of the verdict the defendant filed his motion for a new trial, assigning forty-five grounds therefor, and after the expiration of the four days, by leave of the court, he added a forty-sixth ground, to-wit, that Albert Chitwood, one of the twelve jurors who tried the case, had formed and expressed an opinion before he was selected as one of the jurors, and had stated that if he were to sit on the jury that should try the Spaughs he would hang the jury if they did not hang the Spaughs. In support of this ground for new trial the defendant offered the testimony of George Davidson, which tended

to support this charge against the juror, but the State contradicted the evidence of Davidson by the testimony of Joseph Pogue who was present at the time of the alleged conversation, and by the testimony of the juror himself.

Thereupon the court overruled this ground of the motion. The trial court had these witnesses before it and had opportunity to see the witnesses and observe their manner of testifying, and. there was substantial evidence to support its finding and in such case this court will not undertake to interfere with its judgment.

XII. The motion for new trial alleges various acts of misconduct of the jury and the officer having them in charge after the trial had been commenced and the jury had been put in charge of an officer.

The first of these grounds is that the jury were permitted to separate after the trial began. The evidence on this point tended to prove that during the trial, and before the jury had retired to consider their verdict, one of the jurors, Hodges, went with the deputy sheriff, Fitz, from the jury room one night to attend a call of nature. The remaining eleven jurors remained in the jury room locked up. During his absence Hodges, the juror, did not see any person except the deputy sheriff and did not talk with him in regard to the case. To reverse a judgment on such a showing as this and for such a separation would be trifling with the administration of justice. [State v. Collins, 86 Mo. 245; State v. Washburn, 91 Mo. l. c. 574; State v. Murray, 91 Mo. l. c. 103; State v. Gregory, 158 Mo. l. c. 147.]

It was also insisted that the jury were guilty of misconduct, because for want of proper place, they occupied the circuit court room at night and on one occasion one of them examined a copy of the general statutes to see how much fees they were allowed for their jury services, and on another evening one of them read a portion of an opinion from one of the Missouri

Reports in a criminal case, for homicide. In State v. Hopper, 71 Mo. 425, it was held that leaving the jury in a room with the State of Missouri Reports and the usual paraphernalia of a court room was no ground for disturbing a verdict. Conceding all shown in this case, the reading of the fee bill in the general statutes and the reading of the decision in an entirely different case, it shows no such misconduct on the part of the jury as would justify us in setting aside their verdict. This ground must be held to be without merit.

Again, it appeared from the evidence of one of the witnesses on the motion for new trial that at the beginning of the trial the prosecuting attorney brought into the court room a shotgun, a Winchester rifle, a pistol and a knife, which he placed under the desk of the clerk, and these weapons remained there during the trial. The shotgun and the pistol were identified and introduced in evidence. For some reason, whether through inadvertence or other cause, the rifle and the knife were not introduced in evidence, but during his argument for the defendant, Judge Frazier, one of the counsel for the defendant, said: "Where is the Winchester rifle? The echo comes to me that it is right where that clerk's desk is there." As far as the record shows this was the only reference made to this rifle, except that the testimony showed that when the defendant left his home on the day of the homicide he was armed with a Winchester rifle. None of the jurors examined this rifle, or saw it until this allusion to it by the counsel for the defendant. The most that can be said of this assignment is that the rifle was placed under the clerk's desk and was not offered in evidence, but was left in the court room in which the jury held their deliberations and was examined by two of them. The testimony on behalf of the State tended to prove that the defendant told Dr. Barnhouse that he, defend-

ant, hit the deceased over the head with a Winchester rifle and bent the barrel. There was no evidence before the court on the motion for new trial that the barrel of the rifle under the clerk's desk was bent. It is evident that the counsel for the defendant knew that this rifle was in the court room and was left there, and it would seem that when the defendant's attorney went outside of the record and commented on the absence of the Winchester rifle from the evidence, it was his purpose to give the jury to understand that by examining the guns under the clerk's desk they would see that the barrel of the Winchester rifle was not bent and that therefore the State's theory was false. Upon a full consideration of this point, we are of the opinion that no prejudice resulted to the defendant from the leaving of this rifle under the desk, but if there was any prejudice it was brought about by the defendant's counsel going out of the record and calling the attention of the jury to the rifle, indicating to them exactly where it could be found.

Error is also assigned because the sheriff Jordan permitted his deputy, H. L. Fitz, to enter the jury room and to deliver to each of the jurors a bottle containing whiskey and to converse with them. As to this point Mr. Jordan, the sheriff, testified that that night after the close of the argument and the jury were about to retire, Fitz, his deputy, came to the door and the sheriff opened it and Fitz gave the sheriff two pint bottles of whiskey and a small glass which held about fifteen drams. The sheriff testified that the jury were very much worn out and fatigued and had requested him on several occasions during the trial to get them a little whiskey, that it might help them, and he spoke to a gentleman in the town, and he said to him that he had some whiskey coming and if he got it he would let him have it. This man gave the whiskey to Fitz to hand to the sheriff. The sheriff testified that he divided the

whiskey by giving each man this small glass full, but had to stint some of them because it would not go around. He testified that Fitz stood there in the room while he was giving the jurors the whiskey, and at that time some of the jurors had gotten to bed. The sheriff testified that Fitz said nothing to the jury while in the room, and Fitz, who was also a witness, testified that he did not speak to the jury about the case, and heard nothing whatever that passed between them, if anything, while he was in there; that he only remained long enough for the sheriff to give them their drinks, possibly three or five minutes, and then retired. He was asked if he did not state to a gentleman after coming out of the jury room, that the jury stood ten to two for conviction, and he answered that he might have told some one his opinion about it, but that he knew nothing about how the jury stood. All that he said to Mr. January was simply an expression of his own opinion. There was no attempt to contradict the evidence of either Jordan or Fitz. The sheriff was placed upon the stand by the defendants. There is positively no evidence that Fitz said anything to the jury at all, but certainly nothing about the case, and they said nothing to him. The sole purpose of his visit was to give the sheriff the whiskey, and he remained until the sheriff had distributed it and gave him the bottle and the glass, and the sole question now is whether this irregularity is sufficient to invalidate the verdict of the jury. Section 2629, Revised Statutes 1899, requires that after the argument is concluded the jury shall retire under the charge of an officer, who shall be sworn to keep them together in some private room or place and not to permit any person to speak to or communicate with them. This section is a wise and salutary one, adopted for the two-fold reason of protecting jurors from all improper influences and to prevent the granting of new trials on account of the officious intermeddling of out-

side parties with the jury. Wherever it has been shown that jurors have been exposed to improper influences, the courts have required that it should be shown affirmatively that no prejudice in fact resulted, but it has not been ruled that every irregularity and violation of the statute shall of itself work a new trial. In State v. Fairlamb, 121 Mo. 137, the alleged irregularity consisted of not keeping the jury in a private place during the trial, and in fact that the jurors were at various times in the main office of a hotel where persons were passing in and out, and it was held as it did not appear that the jurors were spoken to about the case, nor that it was discussed in their presence, there was no reversible error. In 12 Ency. Pl. and Prac., 616, it is said: "Where irregularities only have occurred which do not necessarily or naturally involve the suspicion of improper influence, the approved course is, upon proper presentation of a complaint, for the trial court to examine witnesses and take testimony with a view of ascertaining whether any improper influences have been put in operation to control the mind of any or all of the jurors, and, after the ascertaining of the facts, with the further view of sustaining or setting aside the verdict, as the facts disclosed upon such examination may demand." Outsiders have no right in the jury room or the place occupied by the jury, but the mere temporary presence of outsiders has in many cases been held to have no effect upon the verdict, where no prejudice could have resulted from such intrusion, and it was apparent that the intrusion was not for such a purpose. Thus, in Luster v. State, 11 Hump. (Tenn.) 169, the Supreme Court refused to disturb a conviction because, when the officer left the jury room in retirement to procure wood and water, an individual went into the room, took his seat by invitation and remained until the arrival of the officer, who removed him, there appearing no improper motive for the intrusion, and no

communication having taken place between the intruder and the jurymen. And in State v. Gould, 90 N. Car. 658, the Supreme Court refused to interfere with the action of the trial court in refusing a new trial where it appeared that one person passed through the room where the jury was kept during the night, and another was found asleep in a stupid, drunken condition on a bench in the rear of the room, and was ejected as soon as discovered, and neither of such persons had any communication with any member of the jury, there being no ground for even a suspicion that any undue influence had been brought to bear. And in Green v. State, 59 Mass. 501, the fact that a servant brought dinner into the jury room and removed the dishes therefrom, did not affect the verdict where it was clearly shown that he did not communicate with the jurors nor they with him. So in this case, we are of opinion that it would be going too far to disturb the verdict of the jury in this case upon the mere ground that a lawfully authorized deputy of the sheriff, who had charge of the jury, brought the whiskey to the sheriff and remained in the room only long enough for the jurors to take the drink, before retiring, it clearly appearing that the deputy had no communication with the jury in regard to the case, nor they with him. Of coure, his entering the jury room was improper and irregular, and it is not to be commended or excused as far as he and the sheriff are concerned, but after the reading of all the testimony on this point which the court heard on the motion for new trial, we are unwilling to say that the circuit court committed error in refusing to grant a new trial on the facts disclosed. In State v. West, 69 Mo. 401, a case of murder in the first degree, on the motion for new trial affidavits were filed showing that intoxicating liquor had been supplied to the jury by the sheriff who had charge of them, but there was nothing in the affidavits or in the record which tended in

the least to show that the jurors were at any time in-
toxicated, or that the verdict was procured by improper
means, and this court while condemning the practice of
supplying jurors with intoxicating drinks, held that it
did not follow that the mere fact that the ardent spirits
had been furnished them was sufficient to warrant the
trial or the appellate court in setting aside the verdict,
citing and approving at the same time the decision to
the same effect in State v. Upton, 20 Mo. 399. It re-
sults that in our opinion neither of the charges of mis-
conduct brought against the jury and the officer in
charge of them was sufficient either singly or collect-
ively to require the court to grant a new trial.

As to the final contention, that the verdict of the
jury was the result of passion and prejudice, we have
only to add that in the careful examination of the evi-
dence in the case, we have been unable to discover any-
thing which tends to sustain that criticism of the ver-
dict. It was the function of the jury to weigh the evi-
dence and determine the questions of fact, and if they be-
lieved the evidence of the State, which was in the main
entirely uncontradicted and unimpeached, and given by
officers of the law and professional men, they were jus-
tified in finding that the defendant on the day of the
homicide committed an unprovoked and brutal assault
upon young Edgar and then retreated to his home
which was well equipped with guns and ammunition,
and that then and there he and his brother held coun-
sel and deliberately determined that he would not sub-
mit to arrest for his assault upon the young man. He
saw the sheriff, whom he knew to be the sheriff of the
county, approaching his home and he fully apprehend-
ed the mission of the sheriff, as is evidenced by his sig-
nificant question to him as to whether he had a war-
rant, and when the sheriff told him to come out to the
gate, instead of obeying the command of the officer and
submitting to a lawful arrest he retreated into the

kitchen where his mother and brother had already gone, and when the sheriff, as was his right and duty, followed him and started to enter the house, he and his brother shot him to death, inflicting upon him four mortal wounds and then striking him a blow on the head with a Winchester rifle. The circumstances indicate that they then took the officer's pistol from his dead body and armed with a shot gun, Winchester rifle and the officer's revolver, they fled from the county. After successfully eluding the officers for six days, they were finally overtaken in an adjoining county and refused to surrender to the sheriff and his posse until after they had made a desperate resistance and the defendant's brother had been wounded. The record indicates from beginning to end that the defendant was guilty of a total disregard of the obligations of a law-abiding citizen, and was fatally bent on mischief, and it is inconceivable that the jury with the evidence before them could have reached any other conclusion than that defendant's conduct in killing the officer in the circumstances detailed was anything but murder in the first degree. Such the law denominates it and such the jury were fully justified in finding by their verdict.

We have patiently reviewed and considered all the propositions advanced by the counsel for the reversal of the judgment and in our opinion there is no reversible error in the record, and the judgment of the circuit court must be and is affirmed, and the sentence which the law pronounces is ordered to be carried into execution.

*Burgess, P. J.,* and *Fox, J.,* concur.