**STATE of Missouri, Respondent,**

v.

**Paul O. TAYLOR, Appellant.**

No. WD 50355.

Missouri Court of Appeals,
Western District.

March 12, 1996.

however, find this case instructive regarding this court's interpretation of Missouri's rape shield statute.

James C. Cox, Assistant Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Breck K. Burgess, Assistant Attorney General, Jefferson City, for respondent.

Before SPINDEN, P.J., and BERREY and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Paul Taylor was charged with three counts each of assault in the first degree and armed criminal action. He was convicted of the assault charges and sentenced to 30 years for one count and 15 years for each of the other two counts, all sentences to run concurrently. He appeals his conviction on the grounds that: (1) shotgun shells discovered in a trash can at Mr. Taylor's residence should have been suppressed as the result of an unreasonable search and seizure; and (2) a new trial should have been granted due to misconduct by the jury during deliberations.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Defendant Paul Taylor lived with his sister, Charlotte Robinson, and his nephew, Tremane Gwen. Mr. Taylor is the father of Siera Watson, who was born in December, 1992. Mr. Taylor and Siera's mother, Keyna Watson, had dated for approximately six and one half years but Mr. Taylor had ended the relationship about four months after Siera was born.

At approximately 11:00 p.m. on June 27, 1993, Keyna and a number of her relatives went to see Mr. Taylor to ask him for money to buy milk and diapers for Siera. The car in which Keyna rode was driven by Keyna's sister, Lolita. Also in that car were Keyna's sister-in-law, Mary, Mary's two daughters, Lolita's four daughters, and Keyna's daughter. Keyna's nephew, James Weston, drove a second car. In the back of that car rode four young boys, Dwight and Dennis Watson and Lionel and Lonnie Henderson.

Considered in the light most favorable to the verdict, the evidence showed that Lolita Watson parked her car across the street from the Taylor house and James Weston pulled in directly behind her car. Keyna got out of Lolita's car and walked up to the porch where Mr. Taylor was sitting with his nephew, Tremane Gwen, while the others remained in the two vehicles. Keyna and Mr. Taylor went into the house so that they could speak privately. Mr. Taylor refused to give

Keyna any money for Siera; they returned to the porch and began arguing.

Mr. Taylor's sister, Charlotte Robinson, then came out of the house and began to argue with Keyna. This progressed into a fist fight. Lolita, Mary and James Weston got out of the cars and grabbed Keyna. As they were heading back to their cars, Mr. Taylor came out of the house with a .12 gauge sawed-off shotgun which he fired twice into the air. Lolita, Mary and James Weston put Keyna in the driver's side of Lolita's car but Keyna exited the car on the passenger side of the car. Lolita drove off anyway and proceeded to a nearby gas station where she called the police.

James Weston also returned to his vehicle and attempted to drive off. As he did so, Mr. Taylor ran up to the passenger side of the Weston car and fired a shotgun blast into the rear passenger compartment of the car. Three of the four boys seated in the back seat of the car were seriously injured by the shotgun blast. Mr. Taylor and his nephew, Tremane Gwen, both ran away after the shooting.

Charlotte Robinson consented to a search of her residence by the police officers dispatched to the scene. The officers found two spent and two live .12 gauge shotgun shells in the kitchen trash can and two additional spent .12 gauge shotgun shells in a drawer in an upstairs bedroom. They also recovered two spent .12 gauge shotgun shells in front of the Taylor house—one in the front yard and the other in a storm drain. Tests determined that a spent shotgun shell found in the kitchen trash can and the two spent shotgun shells found in front of the house were fired from the same gun.

Mr. Taylor, testifying on his own behalf, claimed that his nephew, Tremane Gwen, did the shooting. Mr. Gwen, who was 16 years old at the time of the shooting, also testified at trial that he did the shooting. He admitted, however, that he had not told the police or the prosecutor that he did the shooting until the week of Mr. Taylor's trial.

In rebuttal, the State called Mr. Gwen's mother, Charlotte Robinson, who testified that her son did not have the gun when the first shot was fired and that she did not see him shoot the victims.

The jury found Mr. Taylor guilty of three counts of assault in the first degree but not guilty of the armed criminal action charges. This appeal followed.

## II. MS. ROBINSON VALIDLY CONSENTED TO THE SEARCH OF HER RESIDENCE

■ Mr. Taylor contends that the Ms. Robinson's consent to the search of her residence was not valid because the consent was not freely and voluntarily given. Consent is freely and voluntarily given if, considering the totality of the surrounding circumstances, an objective observer would conclude that the person giving consent made a free and unconstrained choice to do so. *State v. Hyland*, 840 S.W.2d 219, 221 (Mo. banc 1992). That determination is dependent upon a number of factors including, but not limited to, the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in custody, whether there was any fraud on the part of the officers, and the evidence of what was said and done by the person consenting. *State v. Smith*, 850 S.W.2d 934, 941 (Mo.App.1993).

■ We determine that, under the totality of the circumstances, Ms. Robinson's consent was given freely and voluntarily. We necessarily base this determination on the evidence given by Detective Gary Wantland, the officer who obtained Ms. Robinson's consent, for neither the State nor Mr. Taylor called Ms. Robinson herself as a witness in their case-in-chief. The State did call her as a rebuttal witness on another issue, but neither the prosecutor nor defense counsel asked Ms. Robinson any questions at that time about her consent to the search. None of the other witnesses were present at the time consent was given.

According to Detective Wantland, he was the only officer to approach Ms. Robinson to seek her consent to search the house. He was not in uniform at the time. While three other officers were present at the scene of the shooting, there is no evidence that any of

the other officers approached Ms. Robinson when consent was sought, nor is there any evidence that Detective Wantland or any other officers had their weapons drawn when consent was requested.

Rather, the evidence showed that when Detective Wantland arrived at the residence in question at approximately 11:15 p.m., Charlotte Robinson represented herself as the owner of the residence. When, approximately twenty-five minutes later, she was asked for permission to search the house at that address, she signed a consent to search form indicating that she voluntarily consented to the search. Detective Wantland testified that Ms. Robinson never limited the scope of the search in any way by her words or actions and did not withdraw her consent in any way.

█ Mr. Taylor notes that he also lived in the house. However, no one at the scene other than Ms. Robinson represented themselves to be in charge of the household and none of those present made any attempt to stop the officers from searching the residence. Similarly, while Mr. Taylor suggests on appeal and suggested in a question at a pre-trial hearing that Ms. Robinson was under arrest at the time she consented to the search, he offered no evidence to support this allegation nor has he offered any evidence that Detective Wantland was aware of her alleged arrest at the time she gave consent. In any event, the mere fact that the person consenting is under arrest does not make the consent invalid. *State v. Hunter,* 750 S.W.2d 134, 136–37 (Mo.App.1988). Finally, there was no evidence of fraud on the part of the officers. In these circumstances, the consent was validly and voluntarily given. Point I is denied.

### III. *JURY MISCONDUCT DID NOT REQUIRE A NEW TRIAL*

Mr. Taylor also argues that jury misconduct occurred which entitled him to a new trial. The evidence relevant to jury misconduct showed that at 4:35 p.m. on the first day of deliberations, the jury informed the trial judge that "[w]e have reached unanimous agreements on Counts 1, 2, [sic] 3 and 5 [the assault charges]. We cannot reach unanimous agreement on Counts 2, 4 and 6 [the armed criminal action charges]." The hammer instruction was given and the jury retired for further deliberation. Later, the jurors requested that they be excused for the evening. They returned the next day and, after deliberating for two hours, found Mr. Taylor guilty of assault under Counts 1, 3, and 5 and not guilty of armed criminal action under Counts 2, 4 and 6.

On October 18, 1994, the prosecuting attorney informed the trial court by letter that "[t]he jury foreman ... told [her] that he visited the library after the case had been submitted to the jury and consulted statutes regarding the range of punishment." Based on this correspondence, Mr. Taylor filed an Amended Motion for Judgment of Acquittal Notwithstanding the Verdict on October 26, 1994. Mr. Taylor alleged jury misconduct as a ground for new trial and requested an order "allowing defendant to inspect the juror questionnaires provided in this case so that the jury foreman may be contacted and his testimony offered to the Court."

█ At a hearing held on October 27, 1994, the alleged jury misconduct and ways to address it were was discussed. In the usual case, jurors may only speak through their verdict. They cannot speak of any partiality or misconduct that transpired in the jury room nor of the motives which induced or operated to produce the verdict. *Babb,* 680 S.W.2d at 153. Here, however, the State did not object to the juror's statement or testimony. By failing to object, the State waived all right to complain of the court's consideration of such evidence. *State v. Viviano,* 882 S.W.2d 748, 750 n. 3 (Mo.App. 1994); *Shearin v. Fletcher/Mayo/Associates, Inc.,* 687 S.W.2d 198, 203 (Mo.App.1984); *State v. Suschank,* 595 S.W.2d 295, 298 (Mo. App.1979). The trial court thus was not barred from considering juror statements or testimony in determining whether the jury saw unauthorized evidence or the prejudicial effect of the use of the unauthorized evidence. *Suschank,* 595 S.W.2d at 298; *Viviano,* 882 S.W.2d at 750 n. 3. The trial court therefore provided the parties with the names and addresses of two jurors so that

they could be contacted about the alleged improper conduct.

A second hearing was held on November 10, 1994. At that time, counsel for Mr. Taylor reported that he had spoken with the two jurors, and that each had told him that three jurors went to the library, independent of one another, and consulted the statutes regarding the range of punishment for both the assault and the armed criminal action charges. At least one juror, Harry Crowell, had copied down part or all of the statutes. Mr. Crowell read these to the jury and the jurors then discussed the ranges of punishment.

The State offered the affidavit of Mr. Crowell into evidence. In his affidavit, Mr. Crowell stated that, on July 14, 1994, he contacted the public library for definitions and penalty upon conviction of the crimes of assault and armed criminal action. He then related this information to the jury on the following day. Mr. Crowell did not recall the definitions at the time his affidavit was prepared but thought that the penalties for conviction were ten years to life, at the judge's discretion. Mr. Taylor's counsel had contacted Mr. Crowell but Mr. Crowell refused to talk with him, stating that he had signed an affidavit and that counsel should "look at the affidavit."

In determining whether the jury's conduct required a new trial, Missouri courts have held that the mere fact that the jury has seen improper evidence does not automatically entitle the defendant to a new trial. § 547.020, RSMo 1986; *State v. Babb*, 680 S.W.2d 150, 153 (Mo. banc 1984); *State v. Kelly*, 851 S.W.2d 693, 695 (Mo.App.1993); *State v. Leisure*, 810 S.W.2d 560, 568 (Mo.App.1991).

 A new trial is *required* to be granted, however, if the defendant has been prejudiced by the juror misconduct. *Kelly*, 851 S.W.2d at 695. A rebuttable presumption of prejudice to the defendant arises upon evidence of improper communications with or other influences on the jury during deliberations. *Id.*; *Babb*, 680 S.W.2d at 153. In *Babb* and subsequent cases, Missouri has held, however, that this presumption can be overcome by competent evidence of a lack of prejudice. To determine the probability of

jury prejudice, the trial court must evaluate the nature of the non-evidentiary material to which the jury was exposed as well as the circumstances surrounding that exposure. *Kelly*, 851 S.W.2d at 696.

Here, the State conceded that Mr. Crowell as well as two other jurors had obtained information regarding the charges and agreed that it was "improper for the jury to seek out the law in addition to what the Court ha[d] given them." The State argued, however, that the evidence, i.e., the jury's verdict in favor of Mr. Taylor on the armed criminal action charges, rebutted this presumption and further argued that Mr. Taylor could not have been prejudiced by the misconduct because the misconduct "could have no effect" on the sole consideration in this case—whether Mr. Taylor or his nephew, Tremane Gwen, committed the offenses. The trial court agreed. It found that, although there was misconduct on the part of the jury, the verdict indicated that there was no prejudice to Mr. Taylor resulting from the misconduct. It therefore denied Mr. Taylor's Amended Motion for New Trial.

 We utilize an abuse of discretion standard to review the trial court's determination not to grant a new trial. Under that standard, we determine whether the court's ruling constituted an abuse of discretion because it offended the logic of the circumstances or was arbitrary and unreasonable. "Abuse" exists when reasonable persons could not differ as to the propriety of the action taken by the trial court. *Kelly*, 851 S.W.2d at 696; *Viviano*, 882 S.W.2d at 751–52. In reaching this determination, we are guided by the rule that the trial judge is in a better position than an appellate court to determine whether the unauthorized evidence prejudiced the defendant. *Kelly*, 851 S.W.2d at 696.

 We do not believe that the trial court abused its discretion in finding a lack of prejudice in this case. The only evidence of outside influence was that the jurors *sua sponte* chose to look up possible sentences for the assault and armed criminal action charges. Prior cases have held that mere reference to such outside sources of informa-

tion about the law or facts is not necessarily prejudicial. For instance, in *State v. McDaniel,* 392 S.W.2d 310 (Mo.1965), the defendant sought a new trial because one of the jurors had visited the scene of the crime at night, during a recess, observed the lighting conditions there, and reported this information to other members of the panel. The court held that, although the juror's actions were "not to be countenanced," there was no indication in the evidence presented that the jury considered the information allegedly imparted to them, nor that it affected its verdict. Therefore, the trial court's refusal to grant a new trial was not an abuse of discretion. *Id.* at 318.

Even more on point is *State v. Spaugh,* 200 Mo. 571, 98 S.W. 55 (1906). In that case, the court found that a juror's conduct in "examin[ing] a copy of the General Statutes to see how much fees they were allowed for their jury services" and another juror's conduct of "read[ing] a portion of an opinion from one of the Missouri Reports in a criminal case for homicide" did not constitute a sufficient showing of misconduct on the part of the jury to justify setting aside the verdict even though the case upon which the jury was deliberating was a homicide case. *Id.* at 608–09, 98 S.W. at 66.

Here, the evidence of prejudicial influence on the jury is non-existent. First, the outside evidence went only to the issue of punishment, and the jury did not decide punishment, just guilt. Second, at the time the jurors improperly looked up the punishments for assault and armed criminal action, they had already agreed to find defendant guilty of assault. The only counts on which they were then unable to reach a verdict were the armed criminal action counts. After reviewing the outside evidence of punishment, the jury found the defendant *not guilty* of any of the three counts of armed criminal action. Thus, even if we were to find that the outside evidence influenced the jury, it could *only* have influenced the jury in *favor* of Mr. Taylor, for after the overnight recess the jury came back in favor of defendant on all counts as to which it had not yet reached a verdict.

For these reasons, we find that the trial court did not abuse its discretion in finding that Mr. Taylor suffered no prejudice as a result of jury misconduct.

For the reasons stated above, the judgment is affirmed.

All concur.