STATE of Missouri, Respondent,

v.

Somer SULLIVAN, Appellant.

No. WD 58537.

Missouri Court of Appeals,
Western District.

July 17, 2001.

James L. McMullin, Kansas City, for appellant.

John Munson Morris, Asst. Atty. Gen., Jefferson City, for respondent.

Before ELLIS, P.J., LOWENSTEIN and BRECKENRIDGE, JJ.

BRECKENRIDGE, Judge.

Somer Sullivan was convicted by a jury of one count of the class B felony of possession of a controlled substance with intent to distribute, § 195.211, RSMo Cum. Supp.1998, three counts of the class C felony of possession of a controlled substance, § 195.202, RSMo 1994, and one count of the class A misdemeanor of possession of drug paraphernalia with intent to use, § 195.233, RSMo Cum.Supp.1998. She was sentenced, concurrently, to eight years in prison for possession of a controlled substance with intent to distribute, five years in prison on each of the three counts of possession of a controlled substance, and one year in jail for possession

of drug paraphernalia. On appeal, Ms. Sullivan challenges the trial court's denial of her motion to suppress her statements to police and all evidence seized after the police stopped her vehicle and later searched her home, generally on three grounds. First, she contends that the stop of her vehicle was made without reasonable suspicion and was pretextual. Second, she argues that she was questioned by officers without being informed of her *Miranda*[1] rights. Third, she challenges the voluntariness of the consents to search her home given by herself and her mother. Finally, she contends that the trial court erred in refusing to submit an instruction to the jury concerning the voluntariness of the consents to search her home.

**Factual and Procedural Background**

On December 4, 1998, Detectives Steven Grubb and Chris Depue of the Jackson County Drug Task Force were conducting surveillance on a house at 11009 East 74th Street in Raytown, Jackson County, Missouri, while awaiting the arrival of a search warrant. While other officers were en route to the residence to execute the warrant, Detective Depue observed three individuals leave the residence and approach a car parked on the street. He notified Detective Grubb, who came around the corner from where he was conducting surveillance. Detective Grubb saw the three individuals, including Brandon McCombs, a resident of 11009 East 74th Street and the primary target of the investigation, get into the car. Mr. McCombs got into the front passenger's seat of the car. Ms. Sullivan got into the driver's seat of the car and another male, Mr. McCombs' cousin, William Clark, got into the back of the car. As the car left the residence, Detective Grubb began following it. Because he

was in an unmarked car without a siren or lights, Detective Grubb contacted the Raytown Police Department and requested that the car be stopped. Ms. Sullivan's car was stopped at 62nd and Woodson, "[a]pproximately eight blocks north and 2 blocks over" from where it left Mr. McCombs' residence.

After a Raytown police officer, Sergeant Michael McDonough, stopped the car, Sergeant McDonough asked the occupants to step out of the car. Detective Grubb then approached the occupants, identified himself, and indicated that the reason for the stop was a narcotics investigation at the house they had just left. Mr. McCombs became agitated following the stop, so Detective Grubb patted him down for weapons.[2] When Mr. McCombs became more confrontational, he was arrested at the scene for narcotics violations, handcuffed and placed in a police car. Detective Grubb then approached Ms. Sullivan, told her why she had been stopped and asked "if she knew anything about what was going on." Ms. Sullivan stated that neither she nor Mr. McCombs was involved in narcotics. She then offered to let Detective Grubb search her car. Before he began the search, Detective Grubb had Ms. Sullivan sign a consent to search form. During the search, Detective Grubb found a Black and Mild cigar band in the back floorboard. Detective Grubb had been informed that individuals at the McCombs residence were using this type of cigar to make "blunts," a hollowed-out cigar in which the tobacco is replaced with marijuana.

While Detective Grubb was searching Ms. Sullivan's car, Detectives Thurman and Iseman arrived on the scene of the car stop. These detectives had been at Mr.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Neither Ms. Sullivan or Mr. Clark were patted down during the car stop.

McCombs' residence just prior to the execution of the search warrant and were instructed to respond to the car stop to assist Detective Grubb. Detective Thurman spoke with Detective Grubb and then with Ms. Sullivan about the search of Mr. McCombs' residence. After that, he called officers at Mr. McCombs' residence to see how the search was progressing. Detective Stacey Edwards, the case agent,[3] informed Detective Thurman that a call had been received from a confidential informant who had received information that Ms. Sullivan was storing drugs in her bedroom at her residence.

After talking with Detective Edwards, Detective Thurman informed Ms. Sullivan that information was received that she might have narcotics in her bedroom of her residence and he asked for consent to search her room. Ms. Sullivan responded that she might have a small bag of marijuana that would cost approximately twenty dollars and a pipe for smoking marijuana, and asked if she would be under arrest. Detective Thurman assured her that she would not be arrested for having a small amount of marijuana and a pipe. Ms. Sullivan then told Detective Thurman that she had to go to work. Ms. Sullivan used Detective Thurman's phone to call her employer. Detective Thurman suggested that she advise her employer that she would be a few minutes late, but Ms. Sullivan told her employer that she would not be in to work that day. When Detective Thurman again asked for consent to search her bedroom, Ms. Sullivan orally consented.

Ms. Sullivan then drove her car to the house where she lived with her mother. Mr. Clark rode with her. Detectives Grubb, Thurman and Iseman and Sergeant McDonough followed in their vehicles, one marked police car and two unmarked undercover vehicles. When they reached Ms. Sullivan's home, the four officers followed her up to her front door. At the front door, they were met by her mother. The officers explained to Ms. Sullivan's mother what was going on. Once inside the house, Detective Grubb requested that Ms. Sullivan sign a written consent to search her bedroom and went over the form with her. Ms. Sullivan signed the consent form. Immediately after signing the consent, Ms. Sullivan ran up the stairs. Detective Thurman followed Ms. Sullivan up to her room. Once in her bedroom, Ms. Sullivan gave Detective Thurman the bag of marijuana she had mentioned, and another small bag of marijuana. While in her room, Detective Thurman noticed other items of contraband in plain view. After Ms. Sullivan gave Detective Thurman the bags of marijuana, they went back downstairs.

While Detective Thurman and Ms. Sullivan were upstairs in Ms. Sullivan's bedroom, Detective Iseman and Sergeant McDonough spoke with Ms. Sullivan's mother and requested her consent to search the areas in the home to which Ms. Sullivan had access. Their discussion occurred at the table in the kitchen and, during the discussion, Ms. Sullivan's mother asked many questions, which the two officers answered. At one point, Ms. Sullivan's mother indicated that she did not know if she should call her attorney. Detective Iseman told her that if she wanted to call her attorney, she could. Ms. Sullivan's mother then attempted to contact her attorney. After about ten minutes of discus-

---

3. As case agent, Detective Edwards' responsibility was to gather the evidence sufficient to obtain the search warrant, obtain the search warrant, make sure a copy of the warrant was left at the residence after the search and make sure that any suspects who might have been involved at the scene were interviewed.

sion, Ms. Sullivan's mother signed a consent form that granted consent to search areas in the home to which Ms. Sullivan had access. Detectives then conducted a thorough search of Ms. Sullivan's bedroom and those access areas.

The narcotics recovered from Ms. Sullivan and from the search were bags of marijuana in the amounts of 12, .6995, and 19.7 grams; a marijuana cigarette; 1603 grams of marijuana in compressed bricks; 5 grams of hallucinogenic mushrooms; three bags containing .32, .184 and .015 grams of LSD gel tabs; two bags containing .1558 and 1.8 grams of cocaine; a glass pipe; an empty bottle of Vitablend powder, which is commonly used as a cutting agent for cocaine; speed loaders for weapons; as well as items used in the sale of narcotics, such as scales and plastic baggies. Ms. Sullivan's mother was concerned by the narcotics found in her daughter's bedroom and orally agreed for the officers to search the entire residence because she wanted all narcotics out of her house.

Following the search, Ms. Sullivan was arrested. She was subsequently charged with one count of the class B felony of possession of a controlled substance with intent to distribute, § 195.211, RSMo Cum. Supp.1998; three counts of the class C felony of possession of a controlled substance, § 195.202, RSMo 1994; and one count of the class A misdemeanor of possession of drug paraphernalia with intent to use, § 195.233, RSMo Cum.Supp.1998. Prior to a preliminary hearing, Ms. Sullivan filed a motion to suppress any statements made by her, as well as the evidence seized as the result of the consents to search her house. Ms. Sullivan argued

that the stop of her car violated her constitutional rights, that the questioning of her at the stop was unlawful and illegal, and that the consents to search her home were not voluntary and freely given by either herself or her mother. Following a suppression hearing, the court denied her motion to suppress.

Prior to trial, Ms. Sullivan renewed her motion to suppress before the circuit judge who was assigned to hear her trial. The trial court, after reviewing the hearing transcript on the motion to suppress and hearing limited arguments from counsel on the motion, agreed with the prior decision after the hearing and overruled Ms. Sullivan's motion, except the trial court excluded statements made by Ms. Sullivan while at her home. A trial was held on March 7 and 8, 2000, at which Ms. Sullivan was found guilty on all counts. She was sentenced, concurrently, to eight years' imprisonment for possession of a controlled substance with intent to distribute, five years' imprisonment for each of the three counts of possession of a controlled substance, and one year in jail for possession of drug paraphernalia with intent to use.[4] This appeal follows.

## Standard of Review

This court's review of a trial court's decision concerning "a motion to suppress evidence is limited to a determination of whether there is substantial evidence to support its decision." *State v. Tackett,* 12 S.W.3d 332, 336 (Mo.App.2000). The decision of the trial court will be reversed only if it is clearly erroneous and this court is " 'left with a definite and firm belief a mistake has been made.' " *Id.* (quoting

4. Ms. Sullivan was sentenced pursuant to § 559.115, which permits the circuit court on its own motion to grant probation anytime up to one hundred twenty days after Ms. Sullivan is delivered to the custody of the department

of corrections. The judgment and sentence also contained the trial court's request that she be placed at the Mineral Point Treatment Center or another substance abuse treatment area.

*State v. Leavitt,* 993 S.W.2d 557, 560 (Mo. App.1999)). This court will view all evidence and any reasonable inferences in the light most favorable to the ruling of the trial court. *Tackett,* 12 S.W.3d at 336. "In reviewing the trial court's ruling on [a motion to suppress], this [c]ourt considers the record made at the suppression hearing as well as the evidence introduced at trial." *State v. Deck,* 994 S.W.2d 527, 534 (Mo. banc 1999). While deference is given to the trial court's determination of the credibility of witnesses, " '[t]he ultimate issue of whether the Fourth Amendment was violated is a question of law which this court reviews *de novo.*' " *State v. Pfleiderer,* 8 S.W.3d 249, 253 (Mo.App.1999) (quoting *State v. McFall,* 991 S.W.2d 671, 673 (Mo.App.1999)). "At a suppression hearing, the State bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled." *State v. Weddle,* 18 S.W.3d 389, 391 (Mo.App.2000); Section 542.296.6, RSMo 1994.

## Denial of Motion to Suppress Was Proper Regarding Car Stop

In her first point, Ms. Sullivan contends that the trial court erred in overruling her motion to suppress. This point actually involves several different bases upon which she claims the motion should have been granted. First, she alleges that the police officer lacked probable cause to stop her vehicle. Next, she contends that the vehicle stop was a pretextual stop. Finally, she claims that she was questioned by police officers while she was a suspect under arrest without being informed of her *Miranda* rights.

### 1. Stop of Ms. Sullivan's Car

■ In arguing that the stop of her car was unlawful, Ms. Sullivan contends that the police lacked "probable cause" to stop her. Ms. Sullivan argues that the police had "no specific and articulable facts linking her to illegal drug activity" when her vehicle was stopped. She claims that her and her passengers' behavior was entirely consistent with an innocent course of conduct.

■ The Fourth Amendment to the United States Constitution protects persons from unreasonable searches and seizures. *See State v. David,* 13 S.W.3d 308, 311 (Mo.App.2000). "Article I, Section 15 of the Missouri Constitution is coextensive with the Fourth Amendment." *Id.* In determining whether the searches and seizures in this case were lawful under the Fourth Amendment, this court begins its analysis with Ms. Sullivan's first claim that the initial stop of her car was invalid.

The State responds to Ms. Sullivan's assertion that the officers had no "probable cause" to make the stop, by pointing out that the actual standard for a car stop under *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is reasonable suspicion, not probable cause. *See State v. Cobb,* 931 S.W.2d 904, 906 (Mo. App.1996). The State claims that the stop was valid because the officers had reasonable suspicion to stop Ms. Sullivan's car under *Terry v. Ohio.* To support this claim, the State asserts the following facts were sufficient grounds for reasonable suspicion: (1) officers were conducting surveillance on the home, preparing to execute a search warrant; (2) the "targets" of the investigation were Mr. McCombs and Ms. Sullivan;[5] (3) shortly before the execution of

5. The States characterization of both Ms. Sullivan and Mr. McCombs as the target of the investigation is not supported by the record of

the suppression hearing or the trial transcript. This statement was made by Detective Depue at trial, but is generally inconsistent

the warrant, Mr. McCombs, Ms. Sullivan, and another male left the residence; (4) officers stopped the vehicle since Mr. McCombs was in the vehicle and Detective Grubb "was concerned that he was transporting narcotics"; and (5) "Mr. McCombs had been involved in an illegal narcotics transaction with an undercover narcotics agent and undercover agents had also received information through trash pulls."

These facts suggest three alternative legal bases for the stop of Ms. Sullivan's car. The first is the detention of an occupant of a premises while a search is being conducted, as authorized by *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). Secondly, that Detective Grubb had reasonable suspicion under in *Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. at 1884, that criminal activity was afoot. Finally, that there was probable cause to arrest Mr. McCombs for his prior sale of drugs to an undercover narcotics agent. We will address these legal bases in order.

First, Mr. McCombs, a passenger in Ms. Sullivan's car, was leaving his home just prior to the police executing a search warrant there. The U.S. Supreme Court case of *Michigan v. Summers*, 452 U.S. at 705, 101 S.Ct. at 2595, held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." The Supreme Court found that the detention did not violate the Fourth Amendment because the intrusion of this type of detention was less than the intrusion of the search and the detention prevented flight of the individual, minimized the risk of harm to the officers, and aided the orderly completion of the search. *Id.*

at 701–03, 101 S.Ct. at 2594. *Summers* was found to apply even though a defendant was stopped after he had driven a short distance from his home, since the police detained the defendant "as soon as practicable after departing from his residence." *U.S. v. Cochran*, 939 F.2d 337, 339 (6th Cir.1991).

Other courts have declined to apply *Summers*, however, when the stop occurred after the defendant had departed from the residence being searched. *See U.S. v. Sherrill*, 27 F.3d 344, 346 (8th Cir.1994); *U.S. v. Boyd*, 696 F.2d 63, 65 n. 2 (8th Cir.1982). The court, in *Sherrill*, declined to extend *Summers* to the facts of that case because, "although Sherrill did help the officers conduct the search, when the officers stopped Sherrill, the officers had no interest in preventing flight or minimizing the search's risk because Sherrill had left the area of the search and was unaware of the warrant." 27 F.3d at 346. Here, none of the justifications for the detention articulated in *Summers* apply. The officers did not have an interest in having Mr. McCombs help the officers conduct the search, nor did they have an interest in preventing Mr. McCombs' flight or minimizing the search's risk since Mr. McCombs left the area of the search and was unaware of the warrant. Therefore, this court finds that the stop of Ms. Sullivan's car was not a detention authorized by *Summers*.

 Alternatively, the State argues that the stop of Ms. Sullivan's car was justified under the principles outlined in *Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. at 1884, because the officers had a reasonable suspicion that Ms. Sullivan or those with her were engaged in criminal activity.

---

with other testimony at the suppression hearing and trial. Detective Grubb testified at the suppression hearing that he was not aware of

any information concerning Ms. Sullivan's alleged involvement in drug activity at the time of the stop.

"[T]o be consistent with the Fourth Amendment, the police must have a reasonable suspicion that criminal activity is afoot based on articulable facts known to the officer making the stop." *State v. Cobb,* 931 S.W.2d at 906. (citing *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884.) While Detective Grubb had a suspicion that the three persons leaving Mr. McCombs' residence might be transporting or moving narcotics from the residence, his concerns were only a suspicion or hunch and were not supported by articulable facts. Neither Detective Grubb nor Detective Depue, who was also conducting surveillence prior to the search, saw anything in their hands or anything being carried from the home. The mere fact that persons are leaving a residence where drugs may be found does not create reasonable suspicion that they are transporting drugs. *See U.S. v. Green,* 111 F.3d 515, 519–20 (7th Cir.1997) (finding "[t]hat on one occasion a car is parked on the street in front of a house where a fugitive resides is insufficient to create reasonable suspicion that the car's occupants had been or are about to engage in criminal activity")/ *People v. Carillo–Montes,* 796 P.2d 970, 974 (Colo.1990) (holding that "[t]he fact that a person keeps cocaine at a residence is simply insufficient to raise a reasonable suspicion that everyone who approaches that residence, and all occupants of the cars used by such person to travel to that residence, are in some way involved in a transaction related to the cocaine").

The third legal ground for the stop of Ms. Sullivan's vehicle is that the stop was authorized to arrest Mr. McCombs. Since there was no arrest warrant outstanding for Mr. McCombs, the arrest was without a warrant. In order for an officer to make a valid warrantless arrest, the officer must have probable cause to believe that the suspect has committed a crime. *Tackett,* 12 S.W.3d at 338, 339. "There is no precise test for determining whether probable cause existed; rather, it is based on the particular facts and circumstances of the individual case." *State v. Clayton,* 995 S.W.2d 468, 477 (Mo. banc 1999). The facts and circumstances justifying probable cause must exist at the time of the arrest. *See State v. Moore,* 659 S.W.2d 252, 255 (Mo.App.1983). There does not need to be "absolute certainty," but the "officer's knowledge of the particular facts and circumstances" must lead a "prudent person[ ]" to believe that "a suspect has committed an offense." *Id.* at 339 (internal quotations and citations omitted). "[P]robable cause is determined by the collective knowledge and the facts available to all of the officers participating in the arrest; the arresting officer does not need to possess all of the available information." *Clayton,* 995 S.W.2d at 477.

At the suppression hearing and at trial, the State presented the testimony of Detective Edwards, the case agent. Detective Edwards testified that the search warrant for Mr. McCombs' house had been procured based upon Mr. McCombs' sale of narcotics to an undercover agent and trash pulls conducted at the house. Detective Edwards testified that at the time Mr. McCombs was identified in the car, there was enough evidence to arrest Mr. McCombs for sale and possession of narcotics. When Detective Edwards learned that Mr. McCombs was leaving his residence, Detective Edwards requested from his supervisor that the vehicle be stopped because Mr. McCombs was leaving the scene. It can be inferred that Detective Edwards' request to stop the vehicle was conveyed to Detective Grubb, the arresting officer, because Detective Grubb, who was alone in his vehicle, used the term "we" in his testimony concerning the decision to stop Ms. Sullivan's car. Thus, from the collective knowledge of the officers partici-

pating in the arrest, there was probable cause to support Mr. McCombs' arrest.

Although the officers' testimony at the suppression hearing and at trial indicates that the stop was not requested explicitly to effectuate the arrest of Mr. McCombs, this fact does not invalidate the seizure. While Detective Grubb placed Mr. McCombs under arrest after he became agitated, the fact remains that at the time of the arrest, Detective Grubb was aware of facts sufficient to establish probable cause for his arrest. *See State v. Heitman*, 589 S.W.2d 249, 254 (Mo. banc 1979). Detective Grubb testified at trial that he actually told Mr. McCombs he was under arrest for investigation of narcotics violations.

The language Detective Grubb used might appear to be problematic as noted in *Heitman*, where a defendant challenged the validity of his arrest because the officer stated that he was being arrested "for investigation of burglary[.]" *Id.* The defendant relied on a prior Missouri Supreme Court case that held that an arrest for investigative purposes and " 'not on a legal charge' " was unlawful. *Id.* (quoting *State v. Hicks*, 515 S.W.2d 518, 522 (Mo. banc 1974)). In rejecting the defendant's argument, however, the Court noted that the "defendant [sought] to turn the officer's phrase into a legal term of art and bind the State to a position depriving the arrest of legal force." *Heitman*, 589 S.W.2d at 254. Further, the court stated that "[t]he facts supplying probable cause to arrest were present and whether the officer subjectively so believed or said, is of no real moment. Such statement did not vitiate the valid arrest with its attendant consequence." *Id.* Here, the evidence supports that Detective Grubb had probable cause to arrest, so his statement that the arrest was for investigation of narcotics violation is inconsequential.

A case with facts very similar to this case is *Sherrill*, 27 F.3d at 347. In that case, the Eighth Circuit Court of Appeals found probable cause for an arrest where "the objective facts of the case reveal[ed] that probable cause existed." There, the defendant left his residence just prior to the police executing a search warrant. *Id.* at 345. A block away from his house, officers stopped the defendant's car and told him about the search warrant and that they would detain him until the search was completed. *Id.* When the defendant agreed to help officers with the execution of the search warrant, the officers placed handcuffs on him, "and read him his rights." *Id.* Officers then took the defendant to the residence and he assisted in the search. *Id.* at 345–46.

The defendant in *Sherrill*, challenged the officers' actions claiming that "when the officers used squad cars to stop his car, placed him in handcuffs, and told him they had a search warrant for his home, the officers' actions amounted to an arrest." *Id.* at 346. He claimed that prior to the search of his house, the officers' had no probable cause to arrest him, and thus his arrest was in violation of the Fourth Amendment. *Id.*

As noted previously, the Eighth Circuit rejected the Government's argument that the "seizure and detention" of the defendant was justified under *Summers*, 452 U.S. at 705, 101 S.Ct. at 2595, but the court determined that "the district court nevertheless properly denied [the defendant's] suppression motion[.]" *Sherrill*, 27 F.3d at 346. The court noted that "[a]lthough the police officers may not have believed that they had probable cause to arrest [the defendant], and indeed, did not apply for an arrest warrant when they applied for the search warrant, we believe the objective facts of the case reveal that probable cause existed." *Id.* at 346–47.

■ From the record in this case, there is evidence that the officers participating in the arrest had probable cause to arrest Mr. McCombs at the time of the stop of Ms. Sullivan's car. Whether Detective Grubb intended to stop the vehicle to effectuate the probable cause arrest or, instead, to detain Mr. McCombs while the search of his residence was being conducted or to investigate the possibility of drugs being transported is irrelevant. "Constitutionally sound probable cause is not dependent upon the subjective intentions of the officer. 'Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" *State v. Lane,* 937 S.W.2d 721, 723 (Mo. banc 1997) (quoting *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

While Ms. Sullivan may argue that she was engaged in an innocent course of conduct, the stop of her vehicle is nonetheless valid since one of its occupants was "subject to seizure for violation of law." *See Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (holding that it is not unreasonable for officers to "stop[ ] an automobile and detain[ ] the driver in order to check his driver's license and registration of the automobile" where "either the vehicle or an occupant is otherwise subject to seizure for violation of law[ ]"). Because the stop of the vehicle was valid, the intrusion suffered by Ms. Sullivan as a result is also valid. *See Johnson v. Grob,* 928 F.Supp. 889, 902 (W.D.Mo.1996) (holding that "an officer needs no cause to stop a particular occupant [there, the driver] of a vehicle where the vehicle contains another occupant [there, a passenger] for whom the officers have probable cause to arrest").[6] In *U.S. v. Hensley,* 469 U.S. 221, 227, 105

S.Ct. 675, 679, 83 L.Ed.2d 604 (1985), the Supreme Court noted that "[a]lthough stopping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion." In *Hensley,* the Supreme Court authorized stops for reasonable suspicion of involvement in *past* crimes under certain circumstances. Certainly this principle is applicable to this case where the stop was not justified based upon reasonable suspicion, but upon probable cause to arrest.

Ms. Sullivan is correct that she was seized within the meaning of the Fourth Amendment when her car was stopped. *See e.g., Hensley,* 469 U.S. at 226, 105 S.Ct. at 679. This seizure occurred, however, based upon probable cause to arrest Mr. McCombs, a passenger of the car. Thus, because officers had probable cause to arrest Mr. McCombs, this court finds that Ms. Sullivan's Fourth Amendment rights were not violated and she was not improperly seized by the car stop. *See Pfleiderer,* 8 S.W.3d at 253 (quoting *McFall,* 991 S.W.2d at 673) (stating that " '[t]he ultimate issue of whether the Fourth Amendment was violated is a question of law which this court reviews *de novo*' ").

■ Ms. Sullivan alternatively argues that the stop was "a pretextual stop, and a fishing expedition by the officers to question [her] concerning her participation in drug activity, and to obtain a consent to search her home...." The basis for her argument is that "[e]vidence procured as a

---

**6.** *See also, Brown v. State,* 989 P.2d 913, 924–25 (Okla.Crim.App.1998) (holding that initial detention of defendant, a passenger in a vehi-

cle, was valid where vehicle was stopped based upon probable cause to arrest another passenger).

result of a pretextual arrest is inadmissible because it is obtained as a result of an arrest made invalid under the Fourth Amendment of the United States Constitution." *State v. Mease,* 842 S.W.2d 98, 105 (Mo. banc 1992). An arrest is pretextual when the sole basis of the arrest was objectively determined to be something other than the warrant. *U.S. v. Prim,* 698 F.2d 972, 975 (9th Cir.1983). Generally, in pretextual cases, the arrest or stop, although generally valid, is based, for example, on an arrest warrant, *see id.,* or traffic violation, *see State v. Poindexter,* 941 S.W.2d 533, 535–536 (Mo.App.1997), that is for a charge or reason unrelated to the evidence seized. That is not the case here. The officers' stated reasons for stopping Ms. Sullivan's vehicle were clearly related to the charge for which Mr. McCombs was arrested and for which she was ultimately arrested. Furthermore, there is no evidence in the record to support Ms. Sullivan's assertion that the officers intended to request a search of her home at the time the car was stopped. The evidence supports the reasonable inference that this intent emerged only after information was gained during the execution of the search warrant at Mr. McCombs' house. Nonetheless, even under the analysis of an alleged pretextual arrest, the stop was valid. *See Mease,* 842 S.W.2d at 105. Having found that the officers had probable cause to arrest Mr. McCombs and to stop Ms. Sullivan's vehicle to do so, they "[did] no more than they [were] objectively authorized and legally permitted to do," and their "motives … are irrelevant." *Id.* at 105–106.

**7.** At the suppression hearing, Ms. Sullivan denied that she brought up the fact that Detective Grubb could search her car. This testimony is contrary to the testimony of Detective Grubb. Determinations of credibility are within the trial court's discretion "and

## 2. Search of Car

On appeal, Ms. Sullivan does not challenge the search of her car and admits that her consent was voluntarily given. Yet a discussion of the events surrounding her consent to search her car is necessary to address the legality of the events that followed. Those events are that upon the request of Detective Grubb, Ms. Sullivan's car was stopped by an officer from the Raytown Police Department, Sergeant McDonough. After the car was stopped, Sergeant McDonough asked the occupants to step out of the car and move to the rear of the car. When Detective Grubb approached Ms. Sullivan, Mr. McCombs and Mr. Clark, he informed them that there was a narcotics investigation concerning Mr. McCombs at his house. At this point, due to Mr. McCombs' confrontational demeanor, he was arrested, handcuffed and placed in a police vehicle. Detective Grubb then spoke with Ms. Sullivan, who identified herself as the driver and owner of the vehicle. When asked by Detective Grubb if she knew anything about the narcotics investigation, Ms. Sullivan replied negatively and indicated that neither she nor Mr. McCombs were involved in narcotics. At that point, according to Detective Grubb, Ms. Sullivan stated that he could search her car if he wanted.[7] Detective Grubb then obtained a consent to search form and read it to Ms. Sullivan. Ms. Sullivan signed the form and even testified at the suppression hearing that she signed the form freely and voluntarily.

As discussed above, the initial seizure of Ms. Sullivan when her car was stopped was valid, having occurred as a

'[a]ll facts are viewed in the light most favorable to the ruling; contrary inferences are disregarded.'" *State v. Mitchell,* 20 S.W.3d 546, 552 (Mo.App.2000) (quoting *State v. Logan,* 914 S.W.2d 806, 808 (Mo.App. W.D. 1995)).

result of the arrest of Mr. McCombs. While Ms. Sullivan remained at the scene beyond the time in which the arrest of Mr. McCombs was effectuated, this fact did not cause the detention to "lose its lawful character." *State v. Slavin,* 944 S.W.2d 314, 318 (Mo.App.1997). A detention could "lose its lawful character[,]" however, if it "extends beyond the time reasonably necessary to effect its initial purpose[.]" *Id.* at 317–318. The discussion between Ms. Sullivan and Detective Grubb immediately following Mr. McCombs' arrest was reasonably related to Mr. McCombs' arrest. *See id.* It was not unreasonable for Detective Grubb to make further contact with the other occupants of the vehicle after having placed Mr. McCombs under arrest. His statement advising Ms. Sullivan of the reason for the stop and the arrest of Mr. McCombs and his inquiry whether Ms. Sullivan knew anything about the narcotics investigation were within the normal period of detention for a stop relating to the arrest of an occupant of the vehicle. The Supreme Court of Missouri held in *State v. Hyland,* 840 S.W.2d 219, 221 (Mo. banc 1992), that a detention did not "extend[ ] beyond the time reasonably necessary to effect its initial purpose," where initial questions by an officer, which led to the defendant giving consent to search, occurred at, or immediately after, the completion of the purpose of the traffic stop.

Furthermore, in response to the initial question by Officer Grubb concerning Ms. Sullivan's knowledge of the narcotics investigation, she volunteered that Officer Grubb could search her car. This, too, occurred immediately after Mr. McCombs arrest. She does not challenge the voluntariness of this consent, and the facts support her admission.[8] Thus, Ms. Sullivan's encounter with police had turned into a consensual one, outside of the ambit of the Fourth Amendment's procedural protections. *See Pfleiderer,* 8 S.W.3d at 254.

## Request to Search Home & Miranda Warnings

■ While Ms. Sullivan does not challenge the consensual nature of the search of her car, she does contend that her detention at the vehicle stop constituted an arrest, that she was then in police custody, and that she should have been advised of her *Miranda* rights. She contends that the failure to advise her of her *Miranda* rights required the exclusion of statements made by her to Detective Thurman that she had small bag of marijuana and a pipe to smoke marijuana in her bedroom at home.

Although Ms. Sullivan raised the argument that these statements were made in violation of *Miranda* in a motion *in limine* prior to trial, she did not object at trial when the statements were first presented during the testimony of Detective Grubb. Thus, Ms. Sullivan has not properly preserved the issue for appellate review. *State v. Johns,* 34 S.W.3d 93, 112 (Mo. banc 2000) *cert. denied,* —— U.S. ——, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001).

Further, while Ms. Sullivan argues that the failure to give *Miranda* warnings cause the consents to be invalid, this court has recently held that the mere request to consent to a search, even after a person is arrested, "[does] not constitute interrogation so as to first require *Miranda* warnings." *State v. Metz,* 43 S.W.3d 374, 382 (Mo.App. W.D.2001). Because Ms. Sullivan has not preserved the *Miranda* violation issue for review, any further discus-

---

8. Courts from other jurisdictions have held that "a volunteering of consent without a prior request from police is a strong indication of voluntariness." *State v. Kennedy,* 290 Or. 493, 624 P.2d 99, 105 (1981).

sion of whether she was in custody is irrelevant at this point and will be discussed only to the extent it has relevance with respect to the issue of the validity of the consent, addressed below.

## Denial of Motion to Suppress Was Proper Regarding Consents to Search Home

While this court finds that the stop of Ms. Sullivan's vehicle was valid and Ms. Sullivan's encounter with the police had turned into a consensual one, Ms. Sullivan still challenges the validity of the consents provided by Ms. Sullivan and her mother with respect to the search of her home. Ms. Sullivan argues that the consents to search signed by her and her mother were "not freely and voluntarily made, but signed under mental distress police pressure . . . and under police domination and police subtrafuge [sic]." Thus, she claims that the evidence seized should have been excluded since it was discovered as the result of an unlawful search of her home.

■■■■ Generally, searches conducted without a valid search warrant are unreasonable and violate Fourth Amendment principles. *State v. McNaughton,* 924 S.W.2d 517, 523 (Mo.App.1996). Exceptions to this general rule exist, however; one exception is a search conducted pursuant to a valid consent. *State v. Woolfolk,* 3 S.W.3d 823, 831 (Mo.App.1999). "Consent is freely and voluntarily given if, considering 'the totality of all the surrounding circumstances,' . . . the objective observer would conclude that the person giving consent made a free and unconstrained choice to do so." *State v. Hyland,* 840 S.W.2d at 221 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973)). This determination involves a consideration of "a number of factors including, but not limited to, the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in custody, whether there was any fraud on the part of the officers, and the evidence of what was said and done by the person consenting." *State v. Taylor,* 917 S.W.2d 222, 224 (Mo. App.1996). The State bears the burden of proving that the consent to search is freely and voluntarily given. *State v. Sanders,* 16 S.W.3d 349, 351 (Mo.App.2000).

### 1. Consent to Search by Ms. Sullivan

■■■ The evidence at the suppression hearing and at trial indicated that Detective Thurman, who requested consent, was at the home of Mr. McComb when Sergeant Bradley was informed that Ms. Sullivan's vehicle was stopped. Detective Thurman was instructed to respond to the scene of the stop and assist Detective Grubb. Detective Thurman arrived at the location of the stop while the search of Ms. Sullivan's car was ongoing. He spoke with Detective Grubb, then Ms. Sullivan. He then called the McCombs residence to see how the search was going. During this phone call, Detective Thurman received information that the officers at the scene suspected that Ms. Sullivan might have been storing narcotics for Mr. McCombs at her home based upon a call from a confidential informant received during the execution of the search warrant. He then asked Ms. Sullivan for consent to search her home. After being assured that she would not be arrested if they found only a small bag of marijuana and a pipe, which she admitted to having, Ms. Sullivan consented to a search of her bedroom. At the time Detective Thurman requested the consent to search her home, Ms. Sullivan was waiting for Detective Grubb to complete the consensual search of her car.

As stated above, the factors to consider in determining whether the consent was

freely and voluntarily made include: "the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in custody, whether there was any fraud on the part of the officers, and the evidence of what was said and done by the person consenting." *Taylor*, 917 S.W.2d at 224.

With regard to the first three factors, the facts are that, at the time consent was requested, there were four officers present at the car stop. There may have been an additional Raytown police officer on the scene, but he was only there briefly to transport Mr. McCombs to jail. Only Detective Thurman requested her consent to search her residence at the car stop. At Ms. Sullivan's residence where she signed the written consent to search, there again were four officers present, along with her mother. Only Detective Grubb spoke with Ms. Sullivan at her home about the written consent to search and asked her to sign it. While Sergeant McDonough was in uniform, Detective Grubb wore a T-shirt and jeans and Detectives Thurman and Iseman wore blue Jackson County Drug Task Force shirts and jeans. No weapons were drawn.

On the issue of whether Mr. Sullivan was in custody, Ms. Sullivan argues that she was in custody and was "merely submitting to a claim of lawful authority" when she gave consent to search. Additionally, she asserts as evidence of custody the fact that she was "escorted and chaperoned by police from the car stop to her home[.]"

The Supreme Court of Missouri considered the question of custody in *State v. Werner*, 9 S.W.3d 590 (Mo. banc 2000), in relation to both the requirement for *Miranda* warnings and seizure under the Fourth Amendment. In discussing custody as it related to *Miranda* warnings, the

Court outlined a number of factors to be considered in determining whether or not a person was in custody, including whether the individual was free to leave, and the purpose, place and length of an interrogation. *Id.* at 595. Also considered are the person's "personal background, experience, familiarity with police questioning, maturity, education and intelligence." *Id.* at 596. In addition, the court outlined six indicia of custody: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere was police dominated; or (6) whether the suspect was placed under arrest at the termination of questioning. *Id.* at 595. "With regard to the first three ... factors, the affirmative presence of one or more of them during questioning 'would tend to mitigate the existence of custody at the time of questioning'". ... The affirmative presence of the last three " 'factors would tend to aggravate the existence of custody.' " *Id.* at 596. The Supreme Court applied this same analysis of custody in considering whether seizure was valid under the Fourth Amendment. *Id.* at 600.

With regard to whether Ms. Sullivan was free to leave and the purpose, place and length of the detention, as discussed above, Ms. Sullivan was involved in a consensual encounter with police during the time in which the conversations with Detective Thurman occurred. Nothing in these facts suggests that the nature of the

encounter with police had changed to something other than a consensual one. "[A] consensual, or voluntary, encounter of a citizen with police is 'characterized by voluntary cooperation of a citizen in response to non-coercive questioning.'" *State v. Pfleiderer*, 8 S.W.3d 249, 254 (Mo. App.1999) (quoting *State v. Childress*, 828 S.W.2d 935, 944–45 (Mo.App. S.D.1992)). Where an "encounter [with police] has turned into a consensual one[,]" further questioning is permissible. *State v. Scott*, 926 S.W.2d 864, 869 (Mo.App.1996). "A seizure does not occur simply because a police officer approaches an individual and asks a few questions." *State v. Hughes*, 899 S.W.2d 92, 98 (Mo.App.1994). The mere discussion with Ms. Sullivan concerning what was learned during the telephone conversation did not escalate this encounter into a seizure. Detective Thurman asked her permission to search the house while the consensual search of her car was continuing.

Ms. Sullivan was pulled over at 62nd and Woodson Streets in Raytown. While the duration of the stop was approximately 40 to 45 minutes, the length can be attributed to the consensual nature of the encounter, that is, to Ms. Sullivan's consent to search her vehicle. During this period of time, Detectives Grubb and Thurman both testified that they told Ms. Sullivan that she was not under arrest. Neither Ms. Sullivan nor Mr. Clark were frisked after Ms. Sullivan's vehicle was stopped. Ms. Sullivan and Mr. Clark sat on the curb while the search of Ms. Sullivan's vehicle was occurring. Their treatment was markedly different from what Ms. Sullivan observed when Mr. McCombs was arrested, where he was patted down, handcuffed and placed in the back of the patrol car. When going to her home to conduct the search, Ms. Sullivan drove herself in her own vehicle, along with Mr. Clark.

■ In turning to the other factors used to determine whether the consent was voluntary, nothing surrounding Detective Thurman's request for consent suggests that there was any fraud involved in that request. From the time of the initial stop, Ms. Sullivan was aware of the purpose for the stop. She was asked for consent to search her bedroom after Detective Thurman talked with the officers at Mr. McCombs' residence and learned of the possibility of narcotics being stored at her home. Ms. Sullivan was fully aware of the reasons for the request. She was concerned with the small amount of marijuana and the pipe, but was instructed that she would not be arrested for such a small amount, but only if a large amount of drugs were found. Although she claims that officers told her that she would be held until they got a warrant to search if she did not consent, the officers denied any such threat, and the trial court was free to disbelieve her assertion. *See Pfleiderer*, 8 S.W.3d at 253. Further, this fact or threat alone is insufficient to "vitiate an otherwise consensual search." *In re $29,000.00 in U.S. Currency*, 682 S.W.2d 68, 77 (Mo.App.1984) (quoting *U.S. v. Dennis*, 625 F.2d 782, 793 (8th Cir.1980), which held that "the fact that a law enforcement officer indicates that he would attempt to obtain or was obtaining a search warrant does not vitiate an otherwise consensual search") (internal quotations omitted).

While Ms. Sullivan was eighteen years old at the time of the stop, she had greater experience than most eighteen-year-olds. For example, it can reasonably be inferred from Ms. Sullivan's use of and familiarity with drug terms that she had experience beyond her age. In addition, Ms. Sullivan had been arrested earlier in the day for failure to appear on traffic citations. She was taken to jail and held in a cell for 20

minutes before she posted bond. She testified that she was not frightened at the time of the original traffic stops or when arrested and taken to jail. While Ms. Sullivan testified that she was afraid at the time of the car stop, there was no outward manifestation that Ms. Sullivan was fearful or intimidated. Her conversations were normal. Ms. Sullivan asked questions of the officers and discussed her circumstances with them. Before she signed the consent form, it was read to her by Detective Grubb and the form advised her that the officers did not have a search warrant, that she had a constitutional right to refuse permission to search, and that any evidence found could be used against her in a court of law. She required that the written form expressly limit the scope of the search to her bedroom only. At the time she signed this written consent form, she was in her own home and in the presence of her mother.

Based upon the totality of the circumstances, this court finds that Ms. Sullivan's consent to search her bedroom was voluntarily and freely given.

### 2. Consent to Search by Ms. Sullivan's Mother

Having found that the consent to search by Ms. Sullivan was freely and voluntarily given, this court must now consider the voluntariness of the consent to search the house given by Ms. Sullivan's mother. This consent must be considered separately since Ms. Sullivan's consent was limited to her bedroom. The consent given by Ms. Sullivan's mother involved the bedroom and area in the house to which Ms. Sullivan had access.

Reviewing the totality of the circumstances and the factors addressed above, this court finds that Ms. Sullivan's mother's consent to search was freely and voluntarily given. Although Ms. Sullivan's mother's age was not in evidence, she was a mature woman with an eighteen-year-old daughter. She owned her home. When the officers arrived at the house, they discussed the reasons for the request with Ms. Sullivan's mother at the dining room table. While other officers were in or around the house, only two were at the table during the time in which her consent was requested and she considered giving it. Neither of the two was in uniform and no weapons were displayed. The discussion with Ms. Sullivan's mother lasted about ten minutes. When she asked, Ms. Sullivan's mother was told that she was free to contact her attorney if she chose. She attempted to do so. While Ms. Sullivan's mother testified that the officers threatened to conduct a more intrusive search if she did not consent, that was denied by the officers. The trial court was free to disregard this assertion. *See Pfleiderer*, 8 S.W.3d at 253. Ms. Sullivan's mother read the written consent to search form before she signed it. The form stated that "the officers [had] no search warrant authorizing the search" and advised her that she had a constitutional right to refuse permission to search and that any evidence found could be used against her in court. She required that the consent form be worded in a certain manner to restrict the scope of the search to the areas in the house to which her daughter had access.

Thus, because both Ms. Sullivan's and her mother's consents were voluntarily and freely given, the trial court did not err in overruling Ms. Sullivan's motion to suppress concerning the evidence found as a result of the consents. Ms. Sullivan's second point is denied.

### No Error in Failing To Instruct the Jury Regarding the Voluntariness of the Consent to Search

In her final point, Ms. Sullivan argues that the jury should have been

given an instruction regarding the voluntariness of her and her mother's consents to the search. She claims to have offered MAI–CR3d 310.06 to the court. In fact, the instruction offered is not the same as MAI–CR3d 310.06, but is similar. MAI–CR3d 310.06 concerns confessions and admissions, yet, the instruction offered by Ms. Sullivan concerned consent to the search.

In *State v. Hofmann,* 895 S.W.2d 108, 114 (Mo.App.1995), the defendant also argued that the voluntariness of his consent to a search should have been submitted to the jury. This court disagreed, holding that "[i]ssues pertaining to whether evidence should be suppressed because of alleged violations of the Fourth Amendment are issues for the trial court, not the jury." *Id.* Thus, the trial court did not err in failing to submit the instruction to the jury. Ms. Sullivan's third point is denied.

The judgment of the trial court is affirmed.

All concur.